UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SOLOMON MEYER, CATHY MEYER, JERRY MEYER,
MALKA MEYER, CHAIM MEYER, SARAH MEYER,
STEVEN MEYER, PEARL MEYER, ELLIOT SCHON,
ESTER ELIZABETH SCHON, TAMMY SCHON, and
YEHUDA SCHON,

Case No.

**COMPLAINT**   1:24-cv-00791 (GTS/ DJS)

Plaintiffs,

-against-

ROBERT HAINES, RACHEL L. HAINES,
JACQUELINE GORDON, MARINO ROMITO,
RUSS MCCABE, LARK HOTELS, LLC, HUNTER
PROPCO, LLC, TOWN OF HUNTER, RAY FEML,
DARYL ELDRED, COUNTY OF GREENE, DYLAN
BEECHER, and ERIK A. JOHNSEN,

Defendants.

Plaintiffs, by their attorneys JAROSLAWICZ & JAROS PLLC, allege as and for their

complaint against the Defendants upon information and belief as follows:

## THE PARTIES

1.      This complaint arises from an incident beginning before sundown Friday, July 14,

2023 ("Friday") and continuing through approximately 11:00 p.m. on Saturday, July 15, 2023

("Saturday").

2.      Each plaintiff is an individual residing in either Lakewood or Toms River, in the

State of New Jersey.

3.      Defendant LARK HOTELS, LLC, is a Massachusetts limited liability company,

with its principal office at 29 Main Street, Amesbury, MA 01913, and authorized to do business

and doing business in New York.

4.      Upon information and belief, at the time of the incident, Defendant LARK HOTELS, LLC, owned the hotel located at 7433 Main Street, Tannersville, Town of Hunter, in the County of Greene, in the State of New York (the "Hotel").

5.      The Hotel was commonly known alternatively as Hunter Inn, Hunter Lodge, and Bluebird Hunter Lodge.

6.      At the time of the incident, Defendant LARK HOTELS, LLC, managed the Hotel.

7.      Defendant HUNTER PROPCO, LLC ("Propco") is a New York limited liability company created and existing pursuant to laws of the State of New York.

8.      At the time of the incident, Propco owned the Hotel.

9.      At the time of the incident, Propco managed the Hotel.

10.     The exact relationship between Lark Hotels, LLC and Hunter Propco, LLC is currently unknown to plaintiffs.

11.     At the time of the incident, the Hotel was a place of public accommodation.

12.     At the time of the incident, Defendant RACHEL L. HAINES ("Lead Manager Rachel Haines") was legally an agent, servant or employee of the Hotel or Propco, or both.

13.     At the time of the incident, Lead Manager Rachel Haines was the lead or head manager of the Hotel.

14.     At all times relevant, Defendant JACQUELINE GORDON ("Manager Jackie") was an agent, servant or employee of the Hotel or Propco, or both.

15.     At the time of the incident, Manager Jackie was a manager or assistant manager of the Hotel.

16.     Defendant TOWN OF HUNTER (the "Town") is a municipal entity created and existing under and by virtue of the laws of New York.

2

17.     At the time of the incident, Defendant ROBERT HAINES ("Sgt. Haines") was the Sergeant in Charge of the Town Police Department.

18.     At the time of the incident, Sgt. Haines and Lead Manager Rachel Haines were husband and wife.

19.     At the time of the incident, Defendant MARINO ROMITO ("Town Officer Romito") was an officer and member of the Town police.

20.     At the time of the incident, Defendant RUSS MCCABE ("Town Officer McCabe") was an officer and member of the Town police.

21.     At the time of the incident, Defendant COUNTY OF GREENE (the "County") is a political subdivision and government municipality created and existing by virtue of the laws of New York.

22.     At the time of the incident, Defendant RAY FEML ("Sgt. Deputy Feml") was an officer and sergeant or deputy sheriff and member of the County Sheriff's police force.

23.     At the time of the incident, Defendant DARYL ELDRED ("Deputy Eldred") was an officer and deputy sheriff and member of the County Sheriff's police force.

24.     At the time of the incident, Defendant DYLAN BEECHER ("Trooper Beecher") was a New York State Trooper.

25.     At the time of the incident, Defendant ERIK A. JOHNSEN ("Trooper Johnsen") was a New York State Trooper.

## JURISDICTION AND VENUE

26.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as the complaint raises causes of action under one or more federal statutes, including 42 U.S.C. §§ 1983, 1985, and 1988.

27.     Plaintiffs also invoke this Court's jurisdiction pursuant to 28 U.S.C. § 1367 over the alleged New York state law claims, as they arise from a common nucleus of operative facts and are related to the claims in this action within the original jurisdiction of this Court such that they form part of the same case or controversy and would ordinarily be expected to be tried in one judicial proceeding.

28.     Venue is properly placed in the Northern District of New York pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims occurred here, or a substantial part of property that is the subject of the action is situated here.

Upon information and belief, each defendant resides in New York; however, to the extent any defendant is a non-domiciliary, that defendant transacts business in New York or contracts to supply goods or services in New York; committed a tortious act in New York; owns, uses or possesses real property situated in New York; or committed a tortious act without New York causing injury to person or property within New York, and either (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in New York, or (ii) expects or should reasonably expect the act to have consequences in New York and derives substantial revenue from interstate or international commerce.

## PRE-COMMENCEMENT PROCEDURES

29.    Prior to the commencement of this action, on behalf of Plaintiffs within 90 days of the incident a verified notice of claim dated October 3, 2023, was served on the Town and on the County, although Plaintiffs believe that in an action such as this a notice of claim is not required.

30.    The Town was served with the notice of claim on October 10, 2023, and it acknowledged that delivery was accomplished on that date.

31.    The County was served with the notice of claim on October 10, 2023, and it acknowledged that delivery was accomplished on that date.

32.    The Town and the County requested that Plaintiffs appear for hearings pursuant to General  Municipal Law § 50-h and Town Law, and Plaintiffs Solomon Meyer and Cathy Meyer so appeared on January 10, 2024; Plaintiffs Malka Meyer, Steven Meyer, Pearl Meyer, and Jerry Meyer so appeared on January 11, 2024; Plaintiffs Chaim Meyer, Ester Elizabeth Schon, and Yehuda Schon so appeared on January 12, 2024; and Plaintiffs Tammy Schon, Elliot Schon, and Sarah Meyer so appeared on January 18, 2024.

33.    No defendant requested the physical examination of any plaintiff, although all plaintiffs were willing to appear if so requested.

34.    The Town and the County have failed or neglected to adjust the claims despite sufficient time to do so prior to the commencement of this action.

## THE UNDERLYING FACTS

35.    Plaintiffs suing herein, along with non-party members of their extended families, wished to spend a peaceful weekend at a furnished lodge in the Catskills from Friday, July 14, 2023, to Sunday, July 16, 2023 ("Sunday").

36.     On July 13, 2023, Plaintiff SARAH MEYER contacted the Hotel and spoke with Manager Jackie to ascertain availability and whether the Hotel would be able to accommodate their religious needs.

37.     Plaintiff SARAH MEYER explained that families were strictly religious Sabbath-observant Jews from Lakewood and Tom's River, New Jersey, and that they could not use electronics, which included electronic keycard door locks, motion-activated faucets and toilets, radios, and telephones, or motor vehicles, from sundown Friday to sundown Saturday night.

38.     The Hotel saw an opportunity to rent out empty rooms for the weekend.

39.     Plaintiff SARAH MEYER stated that the Hotel could expect about 30 to 40 guests, including a number of children.

40.     The Hotel held itself out as child-friendly.

41.     Plaintiff SARAH MEYER stated that due to kosher food restrictions, the guests would bring their own food and eat some of their meals communally, and that they would bring their own extra tables and chairs, if necessary. They also explained that they would be praying in the dining area.

42.     Manager Jackie described a kind of suite-style accommodation available at the Hotel known a chalet, and that each chalet had a kitchen and dining area, as well as bedrooms and other amenities, which would satisfy that need.

43.     The chalets were isolated from the main hotel building, which had standard rooms.

44.     The Hotel advertised its chalets as soundproof.

45.     Manager Jackie assured Plaintiff SARAH MEYER that the Hotel was familiar with and would accommodate their restrictions and Sabbath needs.

46.     Plaintiff CATHY MEYER booked a chalet for two nights, Friday, July 14, 2023, and Saturday, July 15, 2023, until Sunday morning.

47.     The separate Jewish families booked and paid for rooms at the Hotel for the same two nights.

48.     In all, at least eight standard rooms were booked and paid for, plus the chalet.

**Respecting the Sabbath is New York State Public Policy**

49.     As expressed in Section 2 of the New York General Business Law, the public policy of New York recognizes the importance of the observance of a sabbath as a "day of the week being by general consent set apart for rest and religious uses," the breaking of which being deemed "serious interruptions of the repose and religious liberty of the community."

50.     Section 6 of the law further recognizes that a person may observe a day other than Sunday as a day "uniformly kept" by him or her "as holy time, and does not labor on that day"; and section 13 of the statute proscribes as a crime the malicious service of civil process on such a Sabbatarian on the Sabbatarian's Sabbath.

51.     At all times relevant, the Hotel knew that the families were all religious Jews who kept kosher and strictly observed widely-recognized rules of the Jewish Sabbath.

The Hotel knew before booking the rooms and had notice that the families would include at least thirty religious Jews, with children among them, who would foreseeably be praying, eating, playing, and otherwise socializing together.

**The Families Arrive Separately**

52.     The various families arrived separately and at different times on Friday afternoon with the last of them arriving prior to the start of the Jewish Sabbath, which began that day at dusk, around 7:45 p.m.

53.     Upon arrival and at all times relevant to this complaint, Plaintiffs were distinctly garbed in distinctive Jewish attire.

54.     The families each checked in separately and went to the various rooms assigned to them by the Hotel.

**Plaintiffs Were Not Engaged in Violence, Drunkenness, or Wild Parties**

55.     Shortly before 8:00 p.m. on Friday, Manager Jackie encountered Plaintiff STEVEN MEYER with some of the younger children outside the chalet and asked them to be quiet, and of course they complied.

56.     At about 8:00 p.m. on Friday, a short prayer service was conducted in the chalet, while some of the women and the younger children remained in their rooms or in a designated children's common area playroom.

57.     During the evening prayers no one was objectively loud, disruptive, or raucous, whether in the chalet, hallways, sitting area, or the playroom.

58.     Following the evening prayers, the various families gathered for a Sabbath meal in the chalet that lasted no more than two hours.

59.     At the meal, there were regular conversation, impromptu lectures on religious topics, and an occasional religious melody by a few individuals.

60.     None of the conversations, lectures, or singing were objectively loud, disruptive, or raucous.

61.     During the meal in the chalet, loud music emanated from the Hotel's tavern or lobby area, and that music could be heard in the sitting area outside the chalet.

62.    During the meal, Manager Jackie knocked on the door to the chalet and told Plaintiff CATHY MEYER that they were "getting complaints of too much noise" and stated that if something was not done about it, everyone would be asked to leave.

63.    Manager Jackie did not identify who had allegedly complained or specifically about whom the complaints were made.

64.    Plaintiff CATHY MEYER expressed surprise because everyone in the chalet was being reasonably quiet, respectful, and well-behaved.

65.    Plaintiff CATHY MEYER announced to everyone in the chalet that they needed to be extra quiet and suggested making a special effort to watch over the children.

66.    After dinner, everyone retired to their beds in their respective rooms by 11:00 p.m., except Plaintiff CATHY MEYER and two older children, who remained in the chalet cleaning up and chatting until about 1:00 a.m.

**On Saturday, Children Quietly Play Cards While Others Pray Offsite**

67.    On Saturday morning, at around 8:00 a.m., Plaintiff MALKA MEYER was seated in the sitting area outside the chalet with some of her children.

68.    Manager Jackie appeared there, observed the situation, and walked away.

69.    At about 8:30 a.m., several men and the older children (the "Morning Prayer Participants") left the Hotel on foot and walked to 37 Central Avenue in Hunter, New York, a property owned by an acquaintance, Abraham Heller.

70.    At the Heller property, the Morning Prayer persons engaged in Sabbath morning prayers and socialized before heading back to the chalet for lunch.

71.    At around 9:00 a.m., some children were eating breakfast in the chalet while two children were playing cards quietly in a sitting area outside the chalet.

72.    During this card play, Manager Jackie came to the sitting area and told Plaintiff CATHY MEYER that the children in the sitting area were, in her opinion, not being supervised.

73.    Plaintiff CATHY MEYER pointed out that she was present and checked on them regularly.

**The Jumping Children Were Not Related to Plaintiffs**

74.    Later that morning, Plaintiffs ELIZABETH SCHON and MALKA MEYER were seated in the sitting area as several of their children played quietly near them.

75.    At that time, two children, names unknown, unrelated to any of the plaintiffs were jumping on a couch and making "tumble-saults" while their parents were in their own chalet room packing suitcases.

76.    None of Plaintiffs' children participated in the jumping or "tumble-sault" activity.

77.    While the Morning Prayer Group was away, the children related to Plaintiffs played quietly, or slept, and eventually got dressed for lunch; and none of them ran or jumped around in a noisy or rowdy manner.

78.    Later that morning, Manager Jackie had another conversation with Plaintiff CATHY MEYER in which she complained about the behavior of "the children," during which Plaintiff CATHY MEYER expressed that she was beginning to feel harassed by such accusations, and that she thought it was a kid friendly hotel, and Manager Jackie stated that it was.

79.    By around 12:30 p.m., the Morning Prayer Group returned to the Hotel and lunch convened in the chalet.

80.    During lunch, Manager Jackie appeared at the entrance to the chalet with her cellphone and asked Plaintiff YEHUDA SCHON, who had come to the door, to have Plaintiff CATHY MEYER speak on the phone with Lead Manager Rachel Haines.

**Plaintiffs Did Not Use Telephones on the Sabbath**

81.     Plaintiff YEHUDA SCHON reminded Manager Jackie that they did not use telephones on the Sabbath and invited Lead Manager Rachel Haines to speak with her in person.

82.     Manager Jackie walked away.

**Plaintiffs Are Told to Leave the Hotel *En Masse***

83.     Sometime after lunch, Manager Jackie told Plaintiff YEHUDA SCHON that everyone in Plaintiffs' alleged "group" was required to vacate the Hotel by 4:00 p.m. that day.

84.     Plaintiffs were shocked as the news spread.

85.     At around 2:00 p.m., Manager Jackie, either acting on her own or at the behest of Lead Manager Rachel Haines—knowing that the police chief of the Town was the husband of Lead Manager Rachel Haines—called the Town police and claimed that there were unwanted guests at the Hotel who were refusing to leave the property because of their religion.

86.     At the time of the incident, the defendants kept the marital relationship between Sgt. Haines and Lead Manager Rachel Haines secret from Plaintiffs.

87.     Due to the marital relationship, Lead Manager Rachel Haines and the Hotel were able to have their way with Plaintiffs because they had at their disposal the Town police as their private security force, paid for by the Town.

88.     Town Officer Romito and Town Officer McCabe ("the Town Officers") responded to the hotel in official police vehicles and spoke with Manager Jackie and Lead Manager Rachel Haines.

89.     At around the same time a number of County police vehicles and State Trooper vehicles also arrived at the hotel.

90.    The Town Officers, wearing Town police uniforms, took Plaintiffs SOLOMON MEYER and CATHY MEYER into a private room where they were joined by four additional uniformed police officers: Trooper Beecher and Trooper Johnsen (the "State Troopers"), and Sgt. Deputy Feml and Deputy Eldred (the "County Deputies"), all acting under color of state law.

91.    The police presence was intimidating and constituted an excessive and disproportionate show of force.

92.    In the private room, the Town Officers told Plaintiffs SOLOMON MEYER and CATHY MEYER that the Hotel's rules had allegedly been violated that all 32 guests in attendance had to vacate the Hotel immediately.

93.    Plaintiff SOLOMON MEYER asked what rules had allegedly been violated, but the Town Officers did not specify and stated only that everyone was trespassing and had to leave.

94.    No such rules were posted or published, nor had any such rules been communicated to Plaintiffs when they booked and paid for their rooms, or when they checked in, and upon information and belief the Hotel had no such rules.

95.    The assertion that all the guests in Plaintiffs' alleged "group" had violated the Hotel's unwritten rules was absurd, irrational, and a pretext.

**Defendants Cause Plaintiffs and their Children to Desecrate the Sabbath in Violation of the Rights Under the First Amendment**

96.    Plaintiff SOLOMON MEYER politely objected to being asked to leave at that time as they could not do the work necessary to pack up and leave the Hotel before sundown, because it would violate the Sabbath. Among other things, he explained that they could not use electronics to find another Hotel, they could not use their vehicles to drive away from the Hotel, and they could not pack up their cars due to Sabbath restrictions.

97.     Through a cellphone set on speakerphone in Manager Jackie's hand, Lead Manager Rachel Haines did not listen and instead yelled that she wanted "all of them" off the property – without specifying whether "them" referred to the children, the parents, or all persons of the Jewish faith who could not leave until after sundown, even if they were directed to do so. "No further conversations!" She said, there was "too much noise," there was singing until 2:00 a.m., and children jumped on furniture.

98.     None of the Plaintiffs' children behaved in such a manner and none of the Plaintiffs' children had behaved other than as reasonably expected for children to behave.

99.     Plaintiff SOLOMON MEYER pleaded to let them stay a few more hours, just until the Sabbath ended at 9:25 p.m., and offered to seclude everyone until then, either in their rooms or on the lawn, but Lead Manager Rachel Haines unreasonably refused, stating: "That ship has sailed."

100.     Plaintiffs could not fathom why it was so urgent that everyone vacate the Hotel immediately, rather than be allowed to remain in their paid rooms until sundown.

101.     Plaintiff SOLOMON MEYER appealed to the police officers to intervene, since the police officers had the power to protect Plaintiffs' rights.

102.     Officer Romito responded, threatening arrest: "You don't understand; it is very simple, staying here is not an option so either leave on your own and if not, I have no problem cuffing every single one of you. I have 50 cuffs in all sizes, including children, and we will take you to the precinct in shifts."

103.     Plaintiff SOLOMON MEYER specifically asked the County Deputies whether there was anything they could do, and the County Deputies said they were just there to assist the Town police at their request.

104.    When the State Troopers were asked a question by any of the individuals being evicted, they responded that the Town police was making all the decisions, and they were there to support the Town police.

105.    None of the police officers intervened to protect Plaintiffs' rights.

106.    The only concession allowed by Lead Manager Rachel Haines was to permit the families to leave their belongings in their rooms—rooms they had paid for—until dark, but in the meantime they would all have to leave the Hotel building immediately into the July 90 degree afternoon heat.

107.    With nowhere else to turn, the families made an exodus on foot from the Hotel to the Heller property, but due to the heat some of the parents with young children could not walk or, due to Sabbath rules, push the children in strollers, that distance.

108.    The Town Officers tried to put some of the children—including two with special needs—into police vehicles, but that induced fear and anxiety, and triggered uncontrollable physical protests from the children.

109.    The police then caused a Kaaterskill tourist Trolley-bus to arrive for the purpose of transporting some of the parents and children to the Heller property.

110.    Despite their express objections on Sabbath-violation grounds, these parents and children were confined to the trolley for the entirety of the trip to the Heller property.

111.    Boarding and traveling in such a vehicle represented a significant violation of Sabbath prohibitions, and forcing these parents to choose between having themselves and their children handcuffed, arrested, and transported to police station on one hand, and breaking the Sabbath on the other hand, was unnecessary, cruel, inconsiderate, outrageous in a moral society, improper, and a violation of their religious rights and freedoms.

112.    Disrespecting their express religious objections to traveling in a vehicle to another property on the Sabbath, one of the Town Officers snidely and offensively told Plaintiffs not to worry: they would not be charged anything for the ride.

113.    After dark, the families each returned to the Hotel to pack up and leave, as a Town police officer watched them without intervening, in continued reliance on the color of state law to enforce the Hotel's instructions.

114.    Lead Manager Rachel Haines permitted the guests only 20 minutes to pack up all their belongings, and restricted their access to one person at a time in a room.

**Other Guests Are Permitted to Blast Loud Music Even as Plaintiffs Are Being Evicted**

115.    At that time, loud music was blaring from a stranger's hotel room, but neither Manager Jackie nor the police officer did anything about it, and Lead Manager Rachel Haines did not tell them or anyone else to take any action.

116.    At no time during their truncated stay at the Hotel did Plaintiffs play any music or turn on a radio.

**The Hotel Does Not Let the Elderly Plaintiffs Stay Until Morning**

117.    Plaintiff SOLOMON MEYER asked whether just he and his wife, Plaintiff CATHY MEYER, the two of them being the eldest of the guests, could stay until morning and avoid having to drive home so late in the dark, but this request was irrationally refused, even though they had paid for the rooms through Sunday morning.

118.    Plaintiff SOLOMON MEYER and his wife had no choice but to drive home at night, not arriving to their home in New Jersey until after 3:00 a.m.

119.    None of the Town Officers, County Deputies, or State Troopers took the side of the Jewish guests or attempted to intercede or reason with Hotel management.

120.    The foregoing acts were done recklessly, intentionally, maliciously, wantonly and with gross indifference to the Plaintiffs' civil rights, thereby entitling them to punitive a/k/a exemplary damages.

**The Hotel Lies to Cover Up What Occurred**

121.    After the incident, the Hotel's CEO, Peter Twachtman issued a statement to the press in which he stated that the Hotel had allegedly welcomed "hundreds of guests from the Hasidic community since re-opening under new ownership in February 2022." (Exhibit A, annexed to Complaint). Assuming this assertion is true, it is a concession that the Hotel knew, or should have known of implications of the receiving religious Jewish guests over their Sabbath.

122.    Attempting to justify the Hotel's actions, the CEO's statement contained false assertions as to what had occurred during the incident, wherein he claimed that

> "[A] large party, including people not staying at the hotel, led to multiple complaints from hotel guests to the staff, including eight guests checking out early from the hotel and requesting refunds.

> "The large 'group' consisted of parents looking after 20 young children who were left unsupervised much of the time. The children were not only loud, but participating in behavior that was dangerous and could have caused harm and injury. The hotel staff spoke with the parents nine times and advised that they would need to quiet down the children and supervise them to ensure everyone's safety and if they were unable to comply, they would be asked to leave the property.

> "The 'group' acknowledged the warnings but took no action. They were unresponsive to both the complaints from fellow guests to quiet the children down and unresponsive to repeated warnings from hotel associates.

> "Given the lack of response from the parents and continued disruption, the hotel staff made the difficult decision to evict the group. They felt they had no choice. The hotel issued refunds to the guests who checked out early."

> (Exhibit A).

123.    Plaintiffs do not adopt the factual assertions made by the CEO to the press in an attempt to justify their unconscionable behavior as will be shown at trial, but rather contend them to be false.

124.    Although Plaintiffs were forced to check out early, they were not refunded.

125.    No one gave Plaintiffs the option or opportunity to reimburse the Hotel for the alleged loss of the eight alleged guests who allegedly left and demanded a refund, although if the eight guests had actually left because of Plaintiffs, Plaintiffs would have agreed to compensate the Hotel to save their leaving the Hotel and violating the Sabbath.

## FIRST CLAIM FOR RELIEF

**Violation of Religious Liberties, and Wrongful Confinement,
in Violation of 42 U.S.C. § 1983
(Against the Police Officers)**

126.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

127.    The Town Officers, County Deputies, and State Troopers (collectively, the "Police Officers"), acting under the color of law and using the authority of their offices, subjected Plaintiffs to the deprivation of their rights, privileges or immunities secured by the U.S. Constitution, including the First Amendment, Fourth Amendment, and Fourteenth Amendment, and laws, in violation of 42 U.S.C. § 1983.

128.    The Police Officers did not have probable cause to arrest, detain, or charge Plaintiffs or their children with trespass under New York Penal Law § 140.05, or any other statute, rule, or regulation.

129.    Plaintiffs never knowingly entered or remained unlawfully upon the Hotel premises.

130.    At no time were any of the plaintiffs unlawfully upon the Hotel premises.

131.    The Police Officers were acting under the color of law when they removed all Plaintiffs from the Hotel premises under the threat of arrest for trespassing.

132.    Despite knowing that probable cause did not exist to detain, arrest, or prosecute Plaintiffs for the violation of any statute, rule, or regulation, the Police Officers acted willfully to cause Plaintiffs to be threatened with a violation and arrest, thereby depriving Plaintiffs of their rights protected by Fourth and Fourteenth Amendments of the U.S. Constitution.

133.    But for the Police Officers' unlawful and malicious conduct and the relationship between Lead Manager Rachel Haines and her husband Sgt. Haines, the chief of the Town police, Plaintiffs would not have been removed from the Hotel premises.

134.    The Police Officers violated Plaintiffs' civil and religious rights, privileges or immunities protected by the First Amendment; refused to accommodate Plaintiffs' religious practices; exhibited blatant and unreasonable disregard for Plaintiffs' religious practices; herded Plaintiffs out of the hotel on their Sabbath under false pretenses; unreasonably refused to permit Plaintiffs to remain within their hotel rooms for a few more hours until sundown Saturday night, when the Sabbath would end and allow them to leave without violating the Sabbath; caused several Plaintiffs and their children to violate, desecrate, and transgress the Sabbath, to the alarm and dismay of themselves and the other Plaintiffs, and against their religious liberties; compelled them to board and travel a distance in the trolley to another property on the Sabbath, constituting a significant violation of Sabbath prohibitions; compelled Plaintiffs to choose for themselves and their children between violating their religious prohibitions and having their children handcuffed, arrested, and booked in the police station, and otherwise violated Plaintiffs' rights under the First Amendment to the U.S. Constitution.

18

135.    In further violation of § 1983, the Police Officers confined at least some of the plaintiffs to the trolley and excluded all Plaintiffs from the Hotel premises and their paid rooms.

136.    Plaintiffs were aware of the confinement and exclusion from the Hotel.

137.    Plaintiffs advised the Police Officers that they did not consent to the confinement, as evidenced by their repeated objections that boarding or traveling in a trolley on the Sabbath was anathema.

138.    The confinement and exclusion were not otherwise privileged and were performed in violation of the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

139.    As a direct and proximate result of the foregoing, Plaintiffs were caused to sustain and suffer severe personal injuries; ruined vacation; forced to board a vehicle on their Sabbath and witnessed family members endure such humiliation and disgrace, compelled to violate and desecrate the Sabbath; were falsely accused of trespassing; suffered alarm and dismay; lost trust in the police; experienced being rounded up; forced to see their children rounded up; were excluded, treated as though they were lesser or second-class citizens, and were carted away *en masse*; forced to endure and contend with antisemitic behaviors; forced to contend with a lack of rationality in government actors; had their civil rights violated; pain and suffering; mental and emotional anguish and distress; and Plaintiffs were otherwise damaged, all of which damages are permanent in nature and continuing into the future.

140.    By reason of the foregoing, the Police Officers, Hotel personnel, and Hotel owners and operators are liable, jointly, individually, and severally, to Plaintiffs for all of their resulting damages in an amount to be determined by a jury at trial.

## SECOND CLAIM FOR RELIEF

### Failure to Supervise and Train under 42 U.S.C. § 1983
### (Against the Town and Sgt. Haines)

141.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

142.    Prior to Friday, the Town and its Sgt. Haines developed and maintained policies, customs, and practices exhibiting deliberate indifference to the constitutional rights of persons in Hunter, which caused the violation of Plaintiffs' rights.

143.    At all relevant times, the Town and its Sgt. Haines were aware that their officers were inadequately trained regarding the First, Fourth, and Fourteenth Amendments, yet the Town and Sgt. Haines maintained a policy or custom of failing to provide their officers with training on the First, Fourth, and Fourteenth Amendments or adequate supervision.

144.    Upon information and belief, the Town was aware of the marital relationship between Sgt. Haines and Lead Manager Rachel Haines, that Lead Manager Rachel Haines was a manager of the Hotel, and that Sgt. Haines would bring to bear the full weight of the Town police force upon persons whom Lead Manager Rachel Haines decided to target.

145.    Upon information and belief, Town and Sgt. Haines were aware that they engaged in a pattern and practice of conduct that violated the U.S. Constitution, as well as the Constitution and laws of New York State, and in a pattern or practice of retaliating against individuals that question or criticize the decisions of the Hotel's manager, or for whatever whim suited the manager, and subjected individuals to retaliatory action.

146.    Sgt. Haines operated under a plain conflict of interest known to the Town but kept undisclosed from the Hotel's guests.

147. Upon information and belief, in reliance on Sgt. Haines's undisclosed marital relationship with Lead Manager Rachel Haines, the Hotel had previously caused others to be evicted or threatened to evicted, including persons who were obviously or apparently religious Jews, from the Hotel, at the direction of Lead Manager Rachel Haines.

148. Town's policies, customs, and practices demonstrate a deliberate indifference to the constitutional rights of persons within the Town and caused the violation of Plaintiffs' rights as alleged herein.

149. Sgt. Haines, a final decisionmaker for the Town police department, instituted a department policy, custom, or practice to enforce the Hotel's instructions, and constitutes a police policy even if it occurred on this occasion alone.

150. As a direct and proximate result of Town's policies, customs, and practices, Plaintiffs were damaged and injured at an amount to be determined at trial.

151. By reason of the foregoing, the Town and Sgt. Haines are liable, jointly, individually, and severally, to Plaintiffs for all of their resulting damages in an amount to be determined by a jury at trial.

## THIRD CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1985**
**(Against the Individual Defendants)**

152. Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

153. At least one or more of the Police Officers conspired with Lead Manager Rachel Haines, the then-undisclosed spouse of Sgt. Haines, of the Town police force, to evict and dispossess Plaintiffs and their children from their lawful presence on the paid hotel rooms.

154.    Plaintiffs had a right to be and remain on the Hotel premises; to exercise their religious freedoms; to be treated equally and protected equally with members of the general public; to be treated equally despite their religion, religious beliefs, or practices; to have their rights to the free exercise of their religion protected without unreasonable interference; and had other protected rights.

155.    The due course of justice was impeded, hindered, obstructed, or defeated by the actions of two or more of the individual defendants who conspired with intent to deny to Plaintiffs the equal protection of the laws, in violation of 42 U.S.C. § 1985(2).

156.    Two or more of the individual defendants intended to injure Plaintiffs because one of the Plaintiffs, or more, attempted to enforce their rights to religious practice that were protected by the laws and the First Amendment.

157.    The due course of justice was impeded, hindered, obstructed, or defeated by the actions of two or more of the individual defendants who conspired with intent to injure Plaintiffs for lawfully enforcing, or attempting to enforce, the right of one or more of the plaintiffs to the equal protection of the laws, in violation of 42 U.S.C. § 1985(2).

158.    By reason of the foregoing, each of the individual defendants who so conspired is liable to Plaintiffs for the injuries, deprivations and damages caused by any of such defendants pursuant to 42 U.S.C. § 1985(3).

<u>**FOURTH CLAIM FOR RELIEF**</u>

**Failure to Intervene, in Violation of 42 U.S.C. § 1986**
**(Against Lead Manager Rachel Haines, Manager Jackie, and the Police Officers)**

159.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

160.    At least two of the defendants among Sgt. Haines, Lead Manager Rachel Haines, Manager Jackie, the Town Officers, the County Deputies, and the State Troopers, conspired for the purposes of impeding, hindering, obstructing or defeating, in any manner, the due course of justice in New York, with intent to deny to Plaintiffs the equal protections of the laws, or injure Plaintiffs for lawfully attempting to enforce their right to the equal protection of the laws, being one or more wrongs mentioned in 42 U.S.C. § 1985.

161.    Lead Manager Rachel Haines, Manager Jackie each of the Town Officers, County Deputies, and State Troopers were present, precipitated or participated in the events of the incident, had knowledge of the wrongs conspired to be done in violation of 42 U.S.C. § 1985, and had the power to prevent the commission of same with reasonable diligence, but neglected or refused to exercise that power.

162.    By reason of the foregoing, each of the defendants Lead Manager Rachel Haines, Manager Jackie, the Town Officers, the County Deputies, and the State Troopers is liable to Plaintiffs for all damages which each defendant could have prevented, in an amount to be determined by a jury at trial, pursuant to 42 U.S.C. § 1986.

## FIFTH CLAIM FOR RELIEF

### Attorneys' Fees and Costs Under 42 U.S.C. § 1988
### (Against all Defendants)

163.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

164.    The foregoing events constitute violations of Plaintiffs statutory and constitutional rights, thereby entitling them to attorneys' fees, costs, and disbursements to the fullest extent of the law as permitted by 42 U.S.C. § 1988, from all defendants.

## SIXTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress
### (Against All Defendants)

165.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

166.    Defendants, themselves, by their departments, agents, and employees, were reckless, careless and negligent in falsely confining Plaintiffs; falsely detaining Plaintiffs; perpetrating extreme and outrageous conduct; negligently inflicting emotional distress on Plaintiffs; threatening to arrest and detain Plaintiffs; confining Plaintiffs against their will; colluding and conspiring with Lead Manager Rachel L. Haines, the then-undisclosed spouse of Sgt. Haines, to evict and exclude Plaintiffs and their children from their paid hotel rooms; in the police arriving as a needless show of force in large numbers with numerous police vehicles, as though raiding a major drug ring or violent crime scene, for what was essentially at most a noise complaint; in none of the Police Officers doing anything even to attempt to police themselves and each other, and stop the improper conduct of the Hotel and the other police personnel, whose conduct was clearly offensive and improper in a civilized society; herding Plaintiffs out of their hotel on their Sabbath; inventing and abiding false pretexts and pretenses; reiterating pretexts asserted by others; failing to question the pretexts; failing to intervene and prevent the continued violation of Plaintiffs' rights; refusing to accommodate Plaintiffs' religious practices and beliefs; refusing to permit Plaintiffs to remain within their hotel rooms until 9:30 p.m. after sundown Saturday night, when the Sabbath would end, and when they would be able to leave without violating their religious tenets; causing several Plaintiffs and their children to violate, desecrate and transgress the Jewish Sabbath, to the alarm and dismay of Plaintiffs, and against their religious liberties; compelling Plaintiffs to choose between violating their religious convictions and being

handcuffed and arrested and brought to the station; taking away liberties without due process of law; depriving Plaintiffs of the rights, privileges, or immunities secured by the U.S. and New York Constitutions and laws; taking property without just compensation without due process; engaging in conduct that deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures; undertaking the police conduct in bad faith; employing excessive force; promulgating, adopting, or following a pattern, custom, policy, or practice, of discrimination against religious Jews, in violation of *Monell v. New York City Dep't of Soc. Svs.,* 436 U.S. 658 (1978); violating the applicable statutes, rules and regulations, including 42 U.S.C. §§ 1983, 1985, 1988; 18 U.S.C. § 242; United States Constitution, amendments First, Fourth, Eighth, and Fourteenth; New York State Constitution Art. I §§ 3 and 11; and defendants violated other constitutional and statutory provisions; the Town Officers knowingly acted in a manner likely to be injurious to the moral welfare of each of the Plaintiffs' children below the age of seventeen by preventing them from practicing their religion, and thereby endangered the welfare of a child or children, in violation of section 260.10 of the New York Penal Law; the Town Officers knowingly acted in a manner likely to be injurious to the mental or physical welfare of the Plaintiffs' children below the age of seventeen by forcing them to leave the Hotel into the hot July afternoon heat, and thereby endangered the welfare of a child or children, in violation of section 260.10 of the Penal Law; the Town Officers knowingly acted in a manner likely to be injurious to the mental or physical welfare of some of the Plaintiffs' children below the age of seventeen, including two with special needs, by physically attempting to place them into a police car, triggering emotional and physical reactions from the children, and thereby endangered the welfare of a child or children in violation of section 260.10 of the Penal Law; the Town Officers knowingly acted in a manner likely to be injurious to moral welfare of Plaintiffs' children under the age of

seventeen when they put the children in a position that required them to violate the Sabbath, which they have always maintained as sacred and sacrosanct, and thereby endangered the welfare of a child or children in violation of section 260.10 of the Penal Law; and Plaintiffs were required to witness, while powerless to prevent, the endangerment of their children below the age of seventeen, causing Plaintiffs to sufficient emotional distress and damages; and were otherwise reckless, careless and negligent.

167.    As a result, Plaintiffs were caused to be injured set forth above.

By reason of the foregoing, the defendants are liable to Plaintiffs for all of their damages in an amount to be determined by a jury at trial.

## SEVENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress
### (Against Lead Manager Rachel Haines, Manager Jackie)

168.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

169.    Defendants' conduct was extreme and outrageous.

170.    Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

171.    Lead Manager Rachel Haines relied on the Town police as their private security force.

172.    The conduct of Lead Manager Rachel Haines and Manager Jackie was vindictive, inhumane, and unacceptable in society.

173.    Lead Manager Rachel Haines abused her position, her connection to Sgt. Haines, the justice system, and the time of public servants, including the police.

174.    The conduct of Lead Manager Rachel Haines and Manager Jackie was deliberate and intended to cause severe emotional distress, or was conducted in disregard of a substantial probability of causing such distress.

175.    The conduct of Lead Manager Rachel Haines and Manager Jackie caused Plaintiffs to sustain injury, including severe emotional distress.

176.    By reason of the foregoing, Plaintiffs were damaged as set forth above.

177.    By reason of the foregoing, the defendants are liable to Plaintiffs for all of their damages caused thereby, in an amount to be determined by a jury at trial.

## EIGHTH CLAIM FOR RELIEF

**Unlawful Discriminatory Practices in
Violation of New York Executive Law §§ 296 (2)(a), (5)(b), (6)
(Against all Defendants)**

178.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

179.    The New York Executive Law provides, in pertinent part:

§ 2. (a) It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, marital status, or status as a victim of domestic violence, of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, including the extension of credit….

§ 5. (b) It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent or lease, land or commercial space: (1) To refuse to sell, rent, lease or otherwise deny to or withhold from any person or group of persons land or commercial space

because of the race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, age, disability, marital status, status as a victim of domestic violence, or familial status of such person or persons….;

(2) To discriminate against any person because of race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, age, disability, marital status, status as a victim of domestic violence, or familial status in the terms, conditions or privileges of the sale, rental or lease of any such land or commercial space; or in the furnishing of facilities or services in connection therewith;

§ 6. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

180.    The Hotel, Lead Manager Rachel Haines, and Manager Jackie were each the owner, lessee, proprietor, manager, superintendent, agent or employee of a place of public accommodation, resort or amusement.

181.    Because of the race or creed of Plaintiffs and their families, directly or indirectly, these defendants refused, withheld from or denied to Plaintiffs the accommodations, advantages, facilities or privileges of the Hotel, in violation of Executive Law § 296(2)(a).

182.    Lead Manager Rachel Haines did incite, compel, or coerce Manager Jackie and the Police Officers in the commission of the foregoing unlawful discriminatory practices, in violation of Executive Law § 296(6).

183.    Sgt. Haines did aid and abet the Hotel and Lead Manager Rachel Haines, and did incite, compel, or coerce the Town Officers in the commission of foregoing unlawful discriminatory practices, in violation of Executive Law § 296(6).

184.    The Hotel, Lead Manager Rachel Haines, and Manager Jackie did deny to or withhold from Plaintiffs commercial space because of their race or creed, in violation of Executive Law § 296(5)(b)(1).

185.    The Hotel, Lead Manager Rachel Haines, and Manager Jackie did discriminate against Plaintiffs because of their race or creed in the terms, conditions or privileges of the sale, rental or lease of commercial space or in the furnishing of facilities or services in connection therewith, in violation of Executive Law § 296(5)(b)(2).

186.    The Police Officers did aid and abet the Hotel, Lead Manager Rachel Haines, and Manager Jackie in the commission of the foregoing unlawful discriminatory practices, in violation of Executive Law § 296(6).

187.    The Town Officers did aid and abet the Hotel, Lead Manager Rachel Haines, and Manager Jackie in the commission of the foregoing unlawful discriminatory practices, in violation of Executive Law § 296(6).

188.    The County Deputies and State Troopers did aid and abet Sgt. Haines and the Town Officers in the commission of foregoing discriminatory acts, in violation of Executive Law § 296(6).

189.    By reason of the foregoing, the Hotel, Lead Manager Rachel Haines, and Manager Jackie, and the Police Officers are liable to Plaintiffs for all of their damages caused thereby, in an amount to be determined by a jury at trial.

## NINTH CLAIM FOR RELIEF

**Violation of New York Civil Rights Law § 40**
**(against The Hotel, Lead Manager Rachel Haines, and Manager Jackie)**

190.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

191.    Section 40 of the New York Civil Rights Law provides in pertinent part:

> § 40. All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. No person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any such place shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof … on account of race, creed, color or national origin…. A place of public accommodation, resort or amusement within the meaning of this article, shall be deemed to include inns, taverns, road houses, hotels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest….

192.    Plaintiffs were entitled to the full and equal accommodations, advantages, facilities and privileges of the Hotel, a place of public accommodation.

193.    The Hotel, Lead Manager Rachel Haines, and Manager Jackie, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any such place did directly or indirectly refuse, withhold from or deny to Plaintiffs the accommodations, advantages, facilities or privileges thereof, on account of race, creed, color or national origin, in violation of Civil Rights Law § 40.

194.    By reason of the foregoing, Plaintiffs were caused to be injured as set forth above.

195.    By reason of the foregoing, Plaintiffs are entitled to recover damages for their injuries from the Hotel, Lead Manager Rachel Haines, and Manager Jackie, jointly, individually, and severally, in amounts to be determined by a jury at trial.

## TENTH CLAIM FOR RELIEF

**Harassment Under New York Penal Law §§ 240.25 and 240.26**
**(Against Town Officer Romito and Manager Jackie)**

196.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

197.    Manager Jackie violated Penal Law § 240.26(2) when, with intent to harass, annoy or alarm Plaintiffs she followed Plaintiffs in the Hotel.

198.    Manager Jackie violated Penal Law § 240.25, when she intentionally and repeatedly harassed Plaintiffs by following them in the Hotel.

199.    Town Officer Romito violated New York Penal Law § 240.26 (1) when with intent to harass, annoy or alarm Plaintiffs, threatened to subject Plaintiffs to the threefold physical contact of handcuffing them and their children, physically placing them in vehicles, and physically transporting them to the police station.

200.    Defendants committed a tort of negligence and intentional infliction of emotional distress upon the parents and the children.

201.    As a result of the conduct of Town Officer Romito, Plaintiffs were caused to be damaged as set forth above.

202.    As a result of the conduct of Manager Jackie, Plaintiffs were caused to be damaged as set forth above.

203.    By reason of the foregoing, Plaintiffs are entitled to recover damages for their injuries from the Hotel, Lead Manager Rachel Haines, and Manager Jackie, jointly, individually, and severally, in amounts to be determined by a judge and jury at trial.

**ELEVENTH CLAIM FOR RELIEF**

*Respondeat Superior* **Liability**
**(Against the Town, County, Lead Manager Rachel Haines,**
**Manager Jackie, and the Hotel)**

204.    Plaintiffs repeat and reallege the foregoing allegations with the same force and effect as though more fully set forth at length herein.

205.    At the time of the incident, the Town Officers were acting as the agents of Lead Manager Rachel Haines, Manager Jackie, or the Hotel, as their private police force.

206.    Lead Manager Rachel Haines is liable for the wrongful conduct and negligence of her agents pursuant to the doctrine of *respondeat superior*.

207.    Manager Jackie is liable for the wrongful conduct and negligence of her agents pursuant to the doctrine of *respondeat superior*.

208.    The Hotel is liable for the wrongful conduct and negligence of its agents, servants and employees pursuant to the doctrine of *respondeat superior*.

209.    At the time of the incident, Sgt. Haines and the Town Officers were acting in their official capacity as members of the Town's police force.

210.    At the time of the incident, the County Deputies were acting in their official capacity as members of the County's police.

211.    At the time of the incident, the County Deputies were acting as agents of the Town and its police force.

212.    At the time of the incident, the State Troopers were acting as agents of the Town and its police force.

213.    Town is liable for the wrongful conduct and negligence of its agents, servants, and employees pursuant to the doctrine of *respondeat superior*.

214.    County is liable the wrongful conduct and negligence of its agents, servants, and employees pursuant to the doctrine of *respondeat superior*.

215.    By reason of the foregoing, Plaintiffs are entitled to recover all of their damages from the Town, County, Hotel, Lead Manager Rachel Haines and Manager Jackie, in amounts to be determined by the trier of fact at trial.

## DEMAND FOR JURY TRIAL

216.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, individually, and severally for all of their damages, compensatory, exemplary, and punitive, in amounts to be determined by a jury at trial, together with costs and reasonable attorneys' fees and pursuant to 42 U.S.C. § 1988 and to the fullest extent permitted by law.

Dated: June 20, 2024

Yours,

JAROSLAWICZ & JAROS PLLC
*Attorneys for Plaintiffs*
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780
dj@lawjaros.com

By: _____
      David Jaroslawicz

# Hunter Lodge Responds to Claims From Jewish Family About Shabbos Ouster

 vinnews.com/2023/07/19/hunter-lodge-responds-to-claims-from-jewish-family-about-shabbos-ouster

July 19, 2023

July 19, 2023 3:14 pm

152

By Baruch Green

HUNTER (VINnews) — Earlier this week, VIN News reported about an incident that took place this past Shabbos at Hunter Lodge, involving a large frum family.

VIN reached out to hotel management for comment, and has received a statement from Peter Twachtman, CEO of Lark Hotels. Mr. Twachtman acknowledged that the eviction took place, and he provided additional details (from the lodge's perspective), to explain the circumstances surrounding the 'difficult decision' by hotel staff.

Here is his response:

'Hunter Lodge, A Bluebird by Lark, in Hunter, New York is a proud member of the Catskills community and has welcomed hundreds of guests from the Hasidic community since re-opening under new ownership in February 2022. Unfortunately, there was an isolated incident over the weekend where a large party, including people not staying at the hotel, led to multiple complaints from hotel guests to the staff, including eight guests checking out early from the hotel and requesting refunds.

The large group consisted of parents looking after 20 young children who were left unsupervised much of the time. The children were not only loud, but participating in behavior that was dangerous and could have caused harm and injury. The hotel staff spoke with the parents nine times and advised that they would need to quiet down the children and supervise them to ensure everyone's safety and if they were unable to comply, they would be asked to leave the property.

The group acknowledged the warnings but took no action. They were unresponsive to both the complaints from fellow guests to quiet the children down and unresponsive to repeated warnings from hotel associates.

Given the lack of response from the parents and continued disruption, the hotel staff made the difficult decision to evict the group. They felt they had no choice. The hotel issued refunds to the guests who checked out early.

We are meeting with local leaders to ensure that this community knows they are welcome and feel comfortable at the property in future.'



**EXHIBIT A**
to Complaint