**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SOLOMON MEYER, CATHY MEYER,
JERRY MEYER, MALKA MEYER,
CHAIM MEYER, SARAH MEYER,
STEVEN MEYER, PEARL MEYER,
ELLIOT SCHON,
ESTER ELIZABETH SCHON,
TAMMY SCHON, and YEHUDA SCHON,

                 Plaintiffs,

          -v-                                        1:24-CV-00791 (AJB/DJS)

ROBERT HAINES, RACHEL L. HAINES,
JACQUELINE GORDON,
MARINO ROMITO, RUSS MCCABE,
LARK HOTELS, LLC, HUNTER PROPCO,
LLC, and TOWN OF HUNTER,

                 Defendants.

_____

**APPEARANCES:**

JAROSLAWICZ & JAROS PLLC
Attorneys for Plaintiffs
225 Broadway, 24th Floor
New York, NY 10007

KAUFMAN DOLOWICH LLP
Attorneys for Hotel Defendants
135 Crossways Park Drive, Suite 201
Woodbury, NY 11797

JOHNSON & LAWS, LLC
Attorneys for Town Defendants
646 Plank Road, Suite 205
Clifton Park, NY 12065

**OF COUNSEL:**

DAVID JAROSLAWICZ, ESQ.
DAVID TOLCHIN, ESQ.

KEITH GUTSTEIN, ESQ.
SOLOMON ABRAMOV, ESQ.

GREGG T. JOHNSON, ESQ.
OLIVIA G. REINHARDT, ESQ.

**Hon. Anthony Brindisi, U.S. District Judge:**

## <u>DECISION & ORDER</u>

### I.    INTRODUCTION

This matter comes before the Court upon the Motion to Dismiss filed by defendants Robert Haines, Russ McCabe, Marino Romito, and the Town of Hunter (collectively, the "Town defendants") and the Motion to Dismiss filed by defendants Jacqueline Gordon, Rachel Haines, Hunter Propco, LLC, and Lark Hotels, LLC (collectively, the "Hotel defendants") pursuant to Federal Rule of Civil Procedure 12(c) and 12(b)(6) respectively.  Plaintiffs Solomon Meyer, Cathy Meyer, Jerry Meyer, Malka Meyer, Chaim Meyer, Sarah Meyer, Steven Meyer, Pearl Meyer, Elliot Schon, Ester Elizabeth Schon, Tammy Schon, and Yehuda Schon ("plaintiffs") oppose the Motions.  The Court heard arguments on May 29, 2025.  Decision was reserved.

For the reasons below, defendants' Motions (Dkt. Nos. 41, 45) are **GRANTED**.

### II.    BACKGROUND[1]

The Meyers and Schons, Sabbath-observant Jews from New Jersey looking to spend Shabbos in the Catskills, booked stays for the weekend of July 14–16, 2023, at the Bluebird Lodge ("Hotel") in Hunter, New York.  Am. Compl., Dkt. No. 37 ¶¶ 30, 33, 39.

Plaintiff Sarah Meyer called ahead the day before plaintiffs' intended arrival.  She informed the on-site hotel manager, defendant Jacqueline Gordon ("Jackie" or "Gordon"), that her party would likely have about 30–40 people, including children—all strict observers of kashrut and the Jewish Sabbath.  *Id.* ¶ 32.

Her party, Meyer explained to Gordon, could not use electronics, including motor vehicles, from sundown Friday to sundown Saturday; wished to bring their own food and eat meals together; and would require a prayer space.  *Id.* ¶¶ 33, 35.  Gordon assured Meyer that the

---

[1] The following factual assertions are taken from plaintiffs' First Amended Complaint ("Am. Compl."), Dkt. No. 37.

Hotel could accommodate these requests and restrictions.  The two then discussed rooming options.  *Id.* ¶ 39.

On Gordon's recommendation, the Meyers reserved one of the Hotel's chalets: a suite-style accommodation, advertised as soundproof, consisting of a full kitchen, living room, and several bedrooms.  Separately, other party members booked "at least" eight "standard" rooms.  The Bluebird's chalets are isolated from the Hotel's main building.  The standard rooms, among them the eight (or more) booked by others in plaintiffs' party, are located therein.  *Id.* ¶¶ 35–41.

Throughout Friday afternoon, plaintiffs arrived at the Bluebird, each clad in distinctive Orthodox Jewish attire.  By Sabbath's start, they had checked in and been directed to their respective accommodations.  *Id.* ¶¶ 46–48.

Shortly after dusk, Gordon, in her first interaction with any plaintiff that weekend, came by Steven Meyer with some younger children outside the Meyers' chalet.  Gordon asked that the group be quieter, and they complied.  *Id.* ¶ 50.  About 15 minutes later, around 8:00 p.m., prayer convened in the Meyers' chalet.  Following the service, plaintiffs' party gathered inside to eat together.  *Id.* ¶¶ 52, 54.

Sometime during the two-hour meal, Gordon knocked on the chalet door.  She informed Cathy Meyer that there had been noise complaints.  If something were not done, Gordon warned, plaintiffs' party would be asked to leave.  *Id.* ¶ 59.  Cathy Meyer, in turn, suggested that the group try to be quieter and make a special effort to watch the children.  *Id.* ¶ 62.  By 11:00 p.m., those gathered retired to their rooms, aside from a trio who stayed up cleaning and chatting for another two hours.  *Id.* ¶ 63.

Around 8:30 a.m. on Saturday, several men and older children from plaintiffs' party (the "Morning Prayer Group") departed the Hotel on foot—walking a mile to the property of an

3

associate, Abraham Heller ("Heller Property").  *Id.* ¶ 66.  There, the attendees spent the morning praying and socializing.  *Id.* ¶ 67.

Meanwhile, back at the Hotel, some children ate breakfast in the Meyers' chalet. Elsewhere, at least two other children played cards.  *Id.* ¶ 68.  Once more, the kids came to the awareness of the on-site Hotel manager, Gordon.  *Id.* ¶ 69.  Gordon spoke with Cathy Meyer, remarking that one group was not being watched.  *Id.* ¶ 69.  Meyer maintained that Gordon was wrong: Meyer was supervising them.  *Id.* ¶ 70.

Later that morning, Gordon again brought up the children, specifically their behavior, with Cathy Meyer.  Meyer, taken aback, remarked that she felt harassed.  She thought the Hotel was child-friendly.  Gordon affirmed the latter sentiment.  *Id.* ¶ 77.

Slightly past noon, plaintiffs' party assembled once more in the chalet for lunch.  *Id.* ¶ 78. As they ate, Gordon came to the chalet door—this time, cellphone in hand.  *Id.* ¶ 79.  Plaintiff Yehuda Schon answered the door.  *Id.*  Gordon, offering the phone, asked that Cathy Meyer speak with Gordon's supervisor, defendant Rachel Haines ("Rachel" or "Haines").  *Id.*  Schon declined on Meyer's behalf.  He reminded Gordon that it was the Sabbath, so plaintiffs did not use electronics.  *Id.* ¶ 80.  But, Schon offered, Meyer could speak to Haines in person if desired. *Id.*  Gordon, seeming annoyed by the rebuff, left to discuss with Haines.  *Id.* ¶ 81.

About an hour and a half later, around 2:00 p.m., Gordon told Yehuda Schon that the party was no longer welcome at the Bluebird: plaintiffs had two hours, until 4:00 p.m., to leave. *Id.* ¶ 88.  Some point later, Gordon called the Hunter Police Department.  *Id.* ¶ 90.  Gordon notified the department that the Hotel had unwanted guests who, citing their religious restrictions as the basis, refused to leave.  *Id.* ¶ 90.

Defendant Officers Marino Romito ("Romito") and Russ McCabe ("McCabe") (collectively "Town Officers") were dispatched by the Town of Hunter. *Id.* ¶ 91. A pair of New York State Troopers and Greene County Deputy Sheriffs later joined them. *Id.* ¶¶ 92, 93. Upon arrival, the two Town Officers spoke with Gordon and Haines. *Id.* ¶ 91. Then, plaintiffs Cathy and Solomon Meyer, along with Town Officers Romito and McCabe, Gordon, the two state troopers, and the two deputy sheriffs, convened in a private room to discuss their dilemma. *Id.* ¶ 93.

There, the Town Officers relayed what they had just been told to Mr. and Mrs. Meyer: plaintiffs' party had violated the Hotel's rules, the party was no longer welcome to remain on the property, and the 32 guests needed to leave. *Id.* ¶ 96. Staff had already told Mr. Meyer and the other guests this. *Id.* ¶ 99. So, the officers added, if plaintiffs continued to refuse, they would be trespassing. *Id.*

Solomon Meyer objected. *Id.* ¶ 103. Sabbath restrictions prevented plaintiffs from packing, driving, or looking for other accommodations until sundown. *Id.* Instead, he asked that they be let to stay in their rooms or outside on the Hotel's lawn—at least until dusk, around 9:25 p.m. *Id.* Haines, from Gordon's speakerphone, declined: there had already been too much noise, children were jumping on furniture, and singing had continued until 2:00 a.m. the prior night. *Id.* ¶¶ 104, 106. But if they desired, Haines offered, plaintiffs could leave their belongings and vehicles and return for them after sundown. *Id.* ¶ 114.

Unable to convince Haines, Meyer turned to the law enforcement officials, asking them to intervene on plaintiffs' behalf. Meyer insisted because plaintiffs were observant Jews with strict religious practices, they were being treated unjustly. *Id.* ¶¶ 108, 109. Unmoved, Officer Romito remarked tersely: "You don't understand; it is very simple, staying here is not an

option[.]" *Id.* ¶ 110. He continued, "[E]ither leave on your own[, or] if not, I have no problem cuffing every single one of you. I have 50 cuffs in all sizes, including children['s], and we will take you to the precinct in shifts." *Id.*

Seeing no viable alternatives, plaintiffs' group made its way to the Heller property down the road. Some walked the mile there, as the Morning Prayer Group had twice earlier that day. Others could not, or did not want to, walk there. *Id.* ¶¶ 114, 115. Officers Romito and McCabe offered their vehicles for transport. *Id.* ¶ 116. Yet this effort turned out impractical. Several children, among them two with special needs, did not want to go in the cruisers. *Id.* ¶ 116. As a result, the officers called for a Kaaterskill Trolley bus. Some voiced dissatisfaction with this plan as well. It, too, violated the Sabbath. Despite the reluctance, the trolley eventually transported those remaining to the Heller property. *Id.* ¶ 117.

Following the Sabbath's end, around 9:30 p.m., plaintiffs returned to the Hotel to retrieve their left-behind belongings. *Id.* ¶ 121. The party was allotted 20 minutes to gather their things, and only one person could be inside a guestroom at a time, as an unidentified Hunter Police officer observed. *Id.* ¶ 122. During the packing, Solomon Meyer asked whether just he and his wife could stay until morning. They wanted to avoid driving back home to New Jersey in the dark. His request was denied. *Id.* ¶ 125.

After the weekend's turmoil, the Hotel's CEO, Peter Twachtman, issued a press statement. *Id.* ¶ 129. In it, Twachtman alleged that the behavior of a large party, including individuals without reservations, had prompted multiple complaints to staff. *Id.* ¶ 130. These complaints, he claimed, led eight guests to check out early and resulted in the Hotel issuing refunds for their abbreviated stays. *Id.* The group in question consisted of parents with 20 young children, many of whom, Twachtman asserted, were left unsupervised for much of the

time. *Id.* Despite warnings from the Hotel, Twachtman stated, the group took no remedial actions, and the unabated disruption ultimately led to their eviction. *Id.* ¶ 130.

Plaintiffs dispute Twachtman's account. They argue it is a mere pretext for discrimination, *id.* ¶ 131, and point to the following as support:

During their Friday dinner, loud music from the Hotel lobby and tavern could be heard outside the chalets. But to plaintiffs' knowledge, no complaints were made about either. *Id.* ¶¶ 57, 58. And on Saturday morning, around 8:00 a.m., plaintiff Malka Meyer sat outside with some of her children when the on-site hotel manager, Gordon, appeared, observed the scene, then walked away without comment. *Id.* ¶¶ 64, 65. Later, plaintiffs Elizabeth Schon and Malka Meyer sat outside while several of their children played nearby. *Id.* ¶ 71. They observed two children—unknown and unrelated to any plaintiff—jumping on a couch and performing "tumble-saults." *Id.* ¶ 72. Yet no warning was given to the two, nor were their parents sought out to discuss the lack of supervision. *Id.* ¶ 75.

When the officers reiterated that plaintiffs needed to leave, Solomon Meyer asked what rules had been violated, but the officers did not, or could not, specify. *Id.* ¶ 98. Nor did the Town Officers investigate the Hotel's allegations, review any video footage, or interview anyone. *Id.* ¶ 100. At no point did the officers take plaintiffs' side or attempt to intercede or reason with management on their behalf. *Id.* ¶ 127. Furthermore, during the 20 minutes when plaintiffs were allowed back onto the Bluebird for their belongings, loud music could be heard, unabated, coming from a hotel room. *Id.* ¶ 123.

And unknown to plaintiffs at the time, defendant Rachel Haines was married to defendant Robert Haines ("Sgt. Haines"), the lead commanding officer of the Town of Hunter Police Department. *Id.* ¶¶ 18, 19. Thus—according to plaintiffs—a standing agreement, "either explicit

or implicit," existed between the off-site hotel manager and the sergeant: "[I]f anyone from the Hotel called the Town police about religious people allegedly causing trouble, the Town police would act in their public capacity to force the guests to leave on any pretext[.]" *Id.* ¶ 84.

This agreement meant that Rachel Haines, and the Hotel, because of her husband's position, "had access to the Town police as [a] private security force[,] empower[ing] them to discriminate against Jewish guests who stood out." *Id.* ¶ 85. "[E]ven Jews on the Jewish Sabbath, and even in the absence of any risk or danger to anyone[.]" *Id.* ¶ 84. Considered together, plaintiffs contend, these are sure indicators of defendants' anti-Jewish animus.

## III.    STANDARD OF REVIEW

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases). Dismissal for failure to state a claim upon which relief can be granted "can be based on one or both of two grounds: (1) a challenge to the 'sufficiency of the pleading' under [Rule] 8(a)(2); or (2) a challenge to the legal cognizability of the claim." *Gibson v. New York State Off. of Mental Health*, 372 F. Supp. 3d 23, 28 (N.D.N.Y. 2019) (Suddaby, J.) (internal citations omitted).

A pleading is generally sufficient where it contains "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2) (emphases added). Rule 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era"; however, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A plaintiff must provide "more than…unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* at 678. Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft*, 556

U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added))).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"While a complaint…does not need detailed factual allegations, a plaintiff's obligation to

provide the grounds of his entitlement to relief requires more than labels and conclusions[.]"

*Twombly*, 550 U.S. at 555. "[F]ormulaic recitation of the elements of a cause of action will not

do." *Id.*

## IV.    DISCUSSION

As a prefatory matter, the Court notes that plaintiffs' Amended Complaint is a "shotgun

pleading." Each of the eleven causes of action asserted in plaintiffs' Amended Complaint

incorporates all preceding factual allegations and adopts the allegations in each prior count.

When a party presents claims this way, it can often be difficult, if not "virtually impossible[,] to

know which allegations of fact are intended to support which claim(s) for relief." *Croons v. New*

*York State Off. of Mental Health*, 18 F. Supp. 3d 193, 199 (N.D.N.Y. 2014) (Hurd, J.) (quoting

*Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). Left

unimpeded, "shotgun pleadings" risk hindering meaningful legal analysis, especially when

consequential factual allegations are missing or entangled with aspersions and legal conclusions.

Analysis becomes only more onerous when opposition papers contradict the operative complaint

or attempt to introduce new factual allegations and when legal claims and theories are

mischaracterized, recharacterized, or redefined ad hoc. Such a "waste of judicial and private

resources[,]" *id.* (quoting *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d

1290, 1333 (11th Cir. 1998)), is in no party's interest.

Pleading deficiencies are, apparently, not of concern to plaintiffs. Rather, plaintiffs skirt the issue: "Although the facts supporting th[ese] allegation[s] may be attacked as circumstantial, at this early pleading stage of the action, under [Rule 12(b)(6) and] Rule 12(c), the Court must award Plaintiffs the benefit of all reasonable inferences[.]" Pls.' Opp'n to Town Defs.' Mem. ("Pls.' Town Opp'n"), Dkt. No. 52 at 23; *see also id.* at 28 ("[Defendants'] argument relies on a determination of the facts in their favor, but on a [Rule 12(b)(6) or] Rule 12(c) motion depends on the allegations.").

In its review, the Court is to "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth[.]" *Ashcroft*, 556 U.S. at 679. The Court must then determine whether the well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* This is "a context-specific task," one "requir[ing] the reviewing court to draw on its judicial experience and common sense." *Id.* "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Offerup Inc. v. Ramtin Software Sols., LLC*, 2024 WL 4362512, at *2 (E.D.N.Y. Sept. 30, 2024) (citing *Twombly*, 550 U.S. at 556). Even so, where "well-pleaded facts do not permit the Court to infer more than the *mere possibility* of misconduct, the complaint has alleged—but it has not *shown*—that the pleader is entitled to relief." *Ashcroft*, 556 U.S. at 679  (quoting Fed. R. Civ. P. 8(a)(2)) (emphases added) (internal alterations omitted).

The problem plaintiffs face here is not that their allegations are circumstantial. It's that most are conclusory statements. "[T]he Court [does] not requir[e] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 544 at 570. Still, "'[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice,' therefore, pleadings that are no more than conclusions are not entitled to the assumption of truth." *Justice v. King*, 2015 WL 1433303, at *9 (W.D.N.Y. Mar. 27, 2015), *aff'd,* 628 F. App'x 58 (2d Cir. 2016) (citing *Ashcroft*, 556 U.S. at 678). The Court "need not consider conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal citations omitted). "[G]eneralized statements, which do not identify who did what, fail[ ] to meet the requisite standard." *Rosado v. Vill. of Goshen*, 2019 WL 1437522, at *7 (S.D.N.Y. Mar. 31, 2019) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991)). If a plaintiff "ha[s] not nudged [their] claims across the line from conceivable to plausible, [their] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### A. Federal Claims

### i.    § 1983 Individual Liability of Sgt. Haines

Most of plaintiffs' federal claims rely on 42 U.S.C. § 1983. Section 1983 "provides a mechanism for enforcing individual rights 'secured' elsewhere"—that is, "rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga University v. Doe*, 536 U.S. 273, 285 (2002). "Standing alone, § 1983 clearly provides no protection for civil rights since…[it] does not provide any substantive rights at all." *McSweeney v. Bayport Bluepoint Cent. Sch. Dist.*, 864 F. Supp. 2d 240, 250 (E.D.N.Y. 2012) (quoting *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 617 (1979)).

To establish a given individual defendant's § 1983 liability, plaintiffs must show that particular defendant's personal involvement in the alleged constitutional deprivations. *See Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "[D]efendant[s] in a § 1983 action may not be held liable for damages for constitutional violations merely because [they]

held…high position[s] of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "[A] successful § 1983 claim holds an individual personally responsible for the role his or her own acts or omissions played in violating someone's constitutional rights[;] that is why an award of § 1983 money damages against an individual defendant is executed against the official's personal assets." *Dukes v. City of Albany*, 492 F. Supp. 3d 4, 12 (N.D.N.Y. 2020) (Hurd, J.) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "That is also why a municipality cannot be held liable under § 1983 merely because it happened to employ the tortfeasor." *Id.* n.6 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). Instead, "under § 1983 local governments are responsible only for 'their *own* illegal acts.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original)).

Plaintiffs do not plausibly allege Sgt. Haines' personal involvement in the events surrounding the instant action. In fact, the only § 1983 claim asserted directly against Sgt. Haines ("Count I") lacks any specific allegations of action or inaction by the sergeant except, ostensibly, in Paragraph 136:

> Pursuant to the understanding and agreement with [Bluebird] Manager Rachel [Haines], Sgt. [Robert] Haines used his power and position with the Town police to deploy officers and to subject Plaintiffs to the deprivation of their rights, privileges or immunities secured by the Constitution, including the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

Am. Compl. at 15.

The operative Complaint does not elaborate on this alleged "agreement" or how it connects Sgt. Haines to the alleged underlying constitutional violations. It merely asserts that Rachel and Robert Haines are married, that plaintiffs were unaware of this marital status, and that somehow, as a natural extension of their marriage, the two possessed a "standing agreement, either explicit or implicit[:] if anyone from the Hotel called…about religious people…causing

trouble, the Town police would act in their public capacity to force the guests to leave on any pretext[.]" *Id.* ¶¶ 19, 84, 86.

If there are grounds to believe such an agreement exists, plaintiffs have failed to present a single plausible one. The only supposed basis provided is the existence of the Haines' marriage. Plaintiffs concede, "[o]bviously, marriage itself does [not] amount to a conspiracy." Pls.' Opp'n to Hotel Defs.' Mem. ("Pls.' Hotel Opp'n"), Dkt. No. 51 at 25. But they insist "[h]owever, the coincidences of this particular marriage raise enormous suspicion." *Id.* Even crediting this conclusory suspicion, it remains wholly unclear what "coincidences" plaintiffs believe warrant the Court's consideration, as plaintiffs do not state them.

Even if some abstract, wide-ranging, generalized agreement to discriminate against "religious people" existed, plaintiffs still do not plausibly allege facts showing that Sgt. Haines was personally involved in any of the alleged constitutional violations complained of here.

Though, one could be forgiven for thinking otherwise. Offered as one statement, Complaint Paragraph 136 provides two discrete assertions about Sgt. Haines. The first, that he "used his power and position with the Town police to deploy officers," is a neutral, generalized statement. It simply indicates the sergeant could and did deploy officers as part of his job. The second, that he "used his power and position with the Town police to…subject Plaintiffs to the deprivation of their rights…" asserts that Sgt. Haines' authority as head of the Hunter Police Department directly led to or caused the violation of plaintiffs' rights.

But this is an entirely separate statement from the first. Again, to sustain their § 1983 claim against Sgt. Haines, plaintiffs must plausibly allege his personal involvement in one of the alleged constitutional violations. Yet the part of the Complaint alleging actions by the sergeant does not accomplish that. It says only that Sgt. Haines used 'his power and position' to deploy

officers, and that Sgt. Haines used 'his power and position' to deprive plaintiffs of their constitutional rights.  It does not plausibly assert that Sgt. Haines deprived plaintiffs of their constitutional rights by deploying Officers McCabe and Romito to the Hotel that weekend.  The two allegations are disjointed: they amount to an *ipse dixit*.  In other words, Count I fails to present a factual assertion of Sgt. Haines' personal involvement in the underlying constitutional violations alleged.

This reading is consistent with the rest of the pleading.  Nowhere do plaintiffs allege that Sgt. Haines was on-site, on duty, in communication with the other defendants, or even aware of the events taking place.  *See, e.g.*, Pls.' Town Opp'n at 21 ("[T]he *inference* that Sgt. Haines used his position and influence over the Town police to assist his wife and her hotel is a reasonable one to draw, particularly at this early pleading stage of this action[;] [a]s such it makes no difference whether Sgt. Haines was on duty or not.") (emphasis added).

Plaintiffs seek to remedy these deficiencies by introducing new factual contentions in their opposition papers: "To the extent Sgt. Haines knew what the Town Officers were doing— and there is every reason to believe that he did, considering he was *likely* with his wife that Saturday afternoon when it was all happening and *likely* shares her views—he could have easily called off the eviction[.]"  Pls.' Town Opp'n at 24 (emphases added).

This is inappropriate.  "In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied heavily upon in the complaint and, thus, are rendered 'integral' to the complaint."  *East v. Roosevelt Union Free Sch. Dist.*, 2020 WL 13753159, at *5 (E.D.N.Y. July 31, 2020) (citing *Chambers v. Time Warner,*

*Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).  The Court declines to contemplate any facts introduced in opposition that do not meet one of those requirements.

At any rate, it is still entirely unclear why plaintiffs believe, let alone have "every reason" to believe, that Sgt. Haines knew what was taking place at that time.  Plaintiffs do not plausibly allege a single fact in support of that conclusion.  Beyond vague and unfounded declarations of a nebulous, possibly unspoken, general anti-religious agreement between husband and wife, the sergeant only appears to be mentioned incidentally.  And even in Count I, Sgt. Haines appears to be an afterthought. *See, e.g.*, Am. Compl. at 9, ¶ 142 (omitting Sgt. Haines from list of liable individual defendants).  Plaintiffs have not sufficiently tied Sgt. Haines to the alleged constitutional violations at issue.  As to Sgt. Haines' individual § 1983 liability, Count I is dismissed.

### ii.    § 1983 Individual Liability of Officers McCabe and Romito

Count II purports to be a single claim levied against the "Town Officers" for "[v]iolation of [r]eligious [l]iberties, and [w]rongful [c]onfinement, in [v]iolation of 42 U.S.C. § 1983[.]" Am. Compl. at 16.

> The Town Officers, acting under the color of law and using the authority of their offices, subjected Plaintiffs to the deprivation of their rights, privileges or immunities secured by the U.S. Constitution, including the First Amendment, Fourth Amendment, and Fourteenth Amendment, and laws[.]

*Id.* ¶ 144.

This conclusory allegation tells the Court little.  As pleaded, Count II amounts to an assertion that the "Town Officers" deprived plaintiffs of "rights…secured by the U.S. Constitution…and laws." *Id.*  But every lawsuit involves at least one law. *See Darby v. New York City Health & Hosps. Corp.*, 2019 WL 1994490, at *3 (E.D.N.Y. May 6, 2019), *aff'd sub*

15

*nom. Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) ("[P]laintiff must also allege facts that amount to a violation of law…no matter how detailed those facts are[.]").  Enumeration of the First, Fourth, and Fourteenth Amendments does not remedy Count II's inexactitude—the three Amendments could be just a few of the "includ[ed]" bases.

Still, what plaintiffs intend is reasonably discernible.  They argue that the "Town Officers" violated their alleged constitutional "right to remain in the public areas of the Hotel premises and in their paid rooms"; unconstitutionally "removed all Plaintiffs from the Hotel premises under the threat of arrest for trespassing"; and, "[i]n further violation of § 1983,…confined at least some of the Plaintiffs to the trolley and excluded all Plaintiffs from the Hotel premises"—all "in violation of the…Fourth and Fourteenth Amendments[.]"  Am. Compl. at 16–18; *see, e.g.,* Pls.' Hotel Opp'n at 7 ("Plaintiffs claim that they had the right to remain at the hotel and in their paid hotel rooms[.]")

And, by their conduct, plaintiffs claim the officers "refused to accommodate Plaintiffs' religious practices[,]" thereby also allegedly "violat[ing] Plaintiffs' rights under the First Amendment[.]"  Am. Compl. at 17; *see* Pls.' Hotel Opp'n at 7 ("Plaintiffs…had the right to…practice their religion without interference from the Hotel or the state[.]  They…were treated differently from other guests at the Hotel, were lumped together because they were Jews, were collectively punished for the alleged infractions of a few unnamed individuals, and were blamed for the conduct of youngsters whom they did not even know.").

Respecting the conduct of Officers McCabe and Romito, the plausible and pertinent factual assertions made by plaintiffs in their Amended Complaint are as follows:

The Town of Hunter dispatched Officers McCabe and Romito to the Hotel on Saturday afternoon.  Upon arrival, the officers spoke with Gordon and Rachel Haines.  They then had a

discussion with Cathy and Solomon Meyer, Gordon, Rachel Haines, two New York State Troopers, and two Greene County Deputy Sheriffs in a private room at the Bluebird. There, the Town Officers reiterated what had been conveyed to them by Bluebird management—plaintiffs were no longer welcome on the Hotel property and were instructed to leave promptly. The officers added that if plaintiffs continued to refuse, they would face arrest for trespassing. At some point following that announcement, plaintiffs vacated the premises, setting course for the Heller Property. A portion of plaintiffs' party walked the mile from the Hotel. Others, due to the uncomfortable temperature, physical difficulties, or other personal restrictions, did not. The Town Officers offered to drive the latter group to Heller's in their police cruisers. That turned out to be impracticable, so the officers called for a trolley car, which ultimately transported those still left.

Plaintiffs muddy these actual allegations through a series of vagaries, equivocations, non sequiturs, under-descriptive verbiage, and evocative language. For instance, the pleadings repeatedly allege that the "Town Officers" "would do as instructed" by Rachel Haines. Yet plaintiffs are loath to say what those alleged instructions entail or whether either officer acted on any such instructions.[2]

---

[2] *See, e.g.*, Pls.' Town Opp'n at 25 ("Plaintiffs have alleged that Rachel engaged in a conspiracy with Sgt. Haines, and the Town Officers under his command…to deprive Plaintiffs of their rights because Rachel wanted it done, and everyone agreed."); Am. Compl. ¶ 113 ("The Town Officers did not contravene Manager Rachel's alleged instructions[.]"); Am. Compl. ¶ 112 ("The Town Officers were part of the conspiracy or complicit in it."); Pls.' Town Opp'n at 21 ("Given the incestuous relationship between the hotel and the Town police, it is not unreasonable to infer that the Town Officers who served under Sgt. Haines command, when they operated at his wife's hotel, would do as she directed, as though the direction came from him."); Pls.' Town Opp'n at 10 ("[H]aving received their marching orders, the Town Officers went to work, doing as Rachel directed."); Pls.' Town Opp'n at 21 ("From the Town Officers' blind obedience to Rachel's orders, it can be inferred that something more was at play than met the eye. That something was, of course, that Rachel and Sgt. Haines were married and that, as a result, the officers…were going to do as Rachel said regardless of the facts."); Pls.' Town Opp'n at 11 ("Contrary to [defendants'] argument, the [Town] [O]fficers' refusal to state what hotel rule was allegedly violated does not make the [Town] [O]fficers impartial moderators. Rather, their failure to respond was an admission that no such rules existed, and that they were going to do as the manager directed regardless of the underlying facts.").

The few times that concrete "actions" by the "Town Officers" are alleged, plaintiffs do not say whether Officer McCabe, Officer Romito, or both were responsible—or even what the underlying conduct might have included. In fact, there are only two factual assertions in the Amended Complaint that even mention Officer McCabe by name:

> ¶ 21. At the time of the incident, Defendant RUSS MCCABE ("Officer McCabe") was an officer and member of the Town's police department.
>
> ….
>
> ¶ 91. Town Officer Romito and Town Officer McCabe (the "Town Officers") came to the Hotel in official police vehicles and spoke with Manager Jackie and Manager Rachel.

Am. Compl. at 3, 10.

Little more is provided regarding Officer Romito. Beyond noting the duo's arrival and a similar statement concerning his employment status, the Complaint mentions Officer Romito just once more:

> ¶ 110. [O]fficer Romito threatened to arrest everyone: "You don't understand; it is very simple, staying here is not an option so either leave on your own and if not, I have no problem cuffing every single one of you. I have 50 cuffs in all sizes, including children['s], and we will take you to the precinct in shifts."

*Id.* at 12.

When a plaintiff's allegations fail to "state precisely what each defendant did and how it violated plaintiff's rights[,] [w]ithout more, plaintiff's allegations fail to state a claim upon which relief may be granted." *Harris v. Summers*, 2014 WL 1340032, at *4 (N.D.N.Y. Apr. 3, 2014) (Kahn, J.).

Even if the Court deems the term "Town Officers" sufficient to indicate the alleged personal involvement of Officers McCabe and/or Romito, the Complaint still suffers from

numerous legal deficiencies intertwined with superficially substantive, yet materially inadequate, "factual" allegations, which prove fatal to plaintiffs' case:

Plaintiffs allege that "the Town Officers *confined* at least some of the plaintiffs to the trolley[.]" Am. Compl. ¶ 151 (emphasis added). "The police…caused a Kaaterskill tourist Trolley-bus to arrive for the purpose of transporting some of the parents and children to the Heller property to be with the others." *Id.* ¶ 117. And "[d]espite their express objections on Sabbath-violation grounds, these parents and children were *confined* to the trolley for the entirety of the trip to the Heller property[.]" *Id.* ¶ 118 (emphasis added).

Plaintiffs also allege that the "Town Officers…*excluded* all Plaintiffs from the Hotel premises and their paid rooms[,]" *id.* ¶ 151, "in violation of the First, Fourth and Fourteenth Amendments[.]" *Id.* ¶ 154 (emphasis added).

Plaintiffs further contend that, in violation of § 1983, "[t]he Town Officers…*removed* all Plaintiffs from the Hotel premises under the threat of arrest for trespassing." *Id.* ¶ 147 (emphasis added). And that "the Town Officers acted willfully to cause Plaintiffs to be threatened with a violation and arrest, thereby depriving Plaintiffs of their rights protected by the Fourth and Fourteenth Amendments[.]"[3] *Id.* ¶ 148.

It does not matter which combination of constitutional amendments and seemingly factual bases plaintiffs assert above; none of these plausibly plead an actionable § 1983 claim against either defendant.

---

[3] Given that the only removal method alleged in the Amended Complaint is Officer Romito's threat of arrest, the Court will assume plaintiffs contend such a "removal" constitutes a violation their Fourth and Fourteenth Amendment rights.

### 1.  § 1983 Substantive Due Process Challenge

It is not immediately obvious what legal theories support these claims, but the Fourth Amendment appears to be a throughline.  Though, plaintiffs also assert that "[u]nder the facts alleged, every one of the operative clauses of [Section 1 of the Fourteenth] Amendment was violated."  Pls.' Town Opp'n at 19.  Among those violations, plaintiffs contend, "[t]he Town Officers…deprived them of their substantive Due Process Rights."  *Id.*

But where a specific constitutional amendment provides an explicit textual source of protection against a particular type of government action, that amendment—not the broader concept of substantive due process—should provide the guiding framework for consideration of such claims.  *See Simons v. New York*, 472 F. Supp. 2d 253, 265 (N.D.N.Y. 2007) (Hurd, J.), *aff'd sub nom. Simons v. Fitzgerald*, 287 F. App'x 924 (2d Cir. 2008) (summary order) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).

The Fourth Amendment provides explicit protection against pretrial deprivations of liberty, making it the proper framework here—not the Fourteenth Amendment.  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

Accordingly, plaintiffs' substantive due process claims against the Town Officers are dismissed.

### 2.  § 1983 Fourth Amendment Challenges

### a.  Wrongful Confinement

Plaintiffs characterize their alleged "wrongful confinement" to be a "detention[.]" *See* Pls.' Town Opp'n at 14 ("[The Town Officers'] conduct itself constitutes a *detention*, as [plaintiffs] were compelled to be confined on the trolleybus to the exclusion of the hotel and could go nowhere else.") (emphasis added).  So this claim arises under the Fourth Amendment.

*See Goodman v. City of N.Y.*, 2024 WL 3532921, at *11 (S.D.N.Y. July 25, 2024) (concluding a § 1983 claim for "unlawful detention" arose under the Fourth Amendment and was best considered as a "false arrest" § 1983 claim); *see also Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 369 (2017).

A "false imprisonment" claim is essentially a reformulated "false arrest" claim. *See Evans v. City of N.Y.*, 308 F. Supp. 2d 316, 329 n.8 (S.D.N.Y. 2004), *aff'd,* 123 F. App'x 433, 433–35 (2d Cir. 2005) (summary order) ("False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment.") (internal citations omitted). Here, plaintiffs allege that they were threatened with arrest. They do not say or suggest that they were, in fact, arrested. Therefore, the Court will consider the alleged "wrongful confinement" claim as a § 1983 "false imprisonment" claim.

For such a claim, the Court looks to state law to determine the requisite elements. *Singleton v. New York City Police Dep't*, 2021 WL 665032, at *5 (S.D.N.Y. Feb. 17, 2021). As the elements under § 1983 are essentially the same as those under New York law, the analysis is identical. *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003).

There are four essential elements of a false imprisonment claim or, in this case, a "wrongful confinement" claim: (1) defendants intended to confine plaintiffs; (2) plaintiffs were conscious of the confinement; (3) plaintiffs did not consent to the confinement; and (4) the confinement was not otherwise privileged. *D'Alessandro v. United States*, 2024 WL 3759759, at *6 (W.D.N.Y. Aug. 12, 2024).

Here, plaintiffs allege that "[t]he police…caused a Kaaterskill tourist Trolley-bus to arrive [to] transport[ ] some of the parents and children to the Heller property." They assert that

21

"the Town Officers *confined* at least some of the plaintiffs to the trolley[,]" and that "[d]espite their express objections on Sabbath-violation grounds, [they] were *confined* to the trolley for [the] trip to the Heller property[.]"  Am. Compl. ¶¶ 118, 151 (emphases added).

No other information is provided.

Plaintiffs may use whatever verbs they prefer when crafting their pleadings.  But evocative verbiage alone is not sufficient to nudge from conceivable to plausible.  The plausibility of these "wrongful confinement" claims depends on the alleged actions the officers took to restrict plaintiffs' corporeal freedom.  Plaintiffs cannot bootstrap their way to discovery by simply repeating that they were allegedly confined and that it was wrong for the officers to have allegedly done so.  The operative complaint's non-conclusory factual allegations fail to give the Court any sense of what conduct is actually being described.

These descriptors are thus conclusory.  *See, e.g.*, *Chavez v. Finney*, 2022 WL 874716, at *8 (S.D.N.Y. Mar. 23, 2022) ("[E]ven assuming plaintiff's use of the legal terms "stop" and "confined" is intended to assert that he was confined prior to his arrest, he fails to state any facts that would support those conclusory assertions, such as describing physical restraint or an order from [defendants] to remain in place."); *Beck v. City of N.Y.*, 2014 WL 80544, at *3 (S.D.N.Y. Jan. 3, 2014) ("Plaintiff's allegation that she 'was confined by defendants,' without more, is simply a legal conclusion.").

Plaintiffs also allege that "[a]s a direct and proximate result of the foregoing" they were "forced to board a vehicle on their Sabbath[.]"  Am. Compl. ¶ 155.  As used in the Amended Complaint, the Court finds that the verb "forced" is conclusory for substantially the same reasons as "confined."

Even if the Court found otherwise, it would make little difference. The Amended

Complaint does not allege that either Officer Romito or Officer McCabe intended to confine

plaintiffs—thereby negating the first essential element of the claim. Putting the intent

requirement aside, plaintiffs fail to state a claim for wrongful confinement:

"Plaintiffs…repeated[ly] object[ed] that boarding or traveling in a trolley on the Sabbath was

anathema." *Id.* ¶ 153. That may be true; plaintiffs may not have thought much of what they saw

as their available options. Still, at no point were plaintiffs obligated or forced by defendants to

board the trolley.

For these reasons, plaintiffs' "wrongful confinement" claims against Officers Romito and

McCabe are dismissed. [4]

### b. Removal and Exclusion

Plaintiffs do not allege an unlawful search. Therefore, as with their confinement, the

Court also considers whether their removal and exclusion are cognizable "seizures" of their

persons. *See Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015).

A seizure occurs "when an officer, by means of physical force or show of authority, in

some way restrains the liberty of a citizen." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16

(1968)) (internal alterations omitted). "To explain when a sufficient 'show of authority' effects

restraint, the Supreme Court has relied on a totality-of-the-circumstances test, asking whether a

reasonable person would believe that he was 'not free to leave.'" *Salmon*, 802 F.3d at 252 (citing

*I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984)). But where a person lacks any desire to leave the

---

[4] At the May 29, 2025 oral argument on the instant motions, in response to a request for clarification of their assertions that the officers had "confined" them, plaintiffs explained that they were "confined" to every location except their respective hotel rooms—only to then insist that use of the term was irrelevant, as they were not claiming false arrest.

location of a challenged police encounter, the 'free to leave' test "may not be the best measure of a seizure[.]" *Salmon*, 802 F.3d at 252 (citing *Florida v. Bostick*, 501 U.S. 429, 434–36 (1991)).

The circumstances alleged here are not analogous to either *Bostick* or *Delgado*—Officers Romito and McCabe were not looking to question or search plaintiffs. Nor were they seeking to prevent plaintiffs from leaving the Hotel grounds. Rather, the Town Officers actively sought plaintiffs' departure. *See Salmon*, 802 F.3d at 253.

Plaintiffs allege that they were removed and excluded from the Bluebird by Officer Romito's threat of arrest. But "[a] claim for *threatened* arrest, seizure or search is not cognizable under the Fourth Amendment." *Dunkelberger v. Dunkelberger*, 2015 WL 5730605, at *15 (S.D.N.Y. Sept. 30, 2015) (quoting *Wilson v. Fla. Dep't of Revenue*, 2015 WL 136557, at *7 (N.D. Cal. Jan. 8, 2015)) (emphasis in original).

"Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. [Second Circuit] precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes." *Id.*; *see Maxwell v. City of N.Y.*, 102 F.3d 664, 668 n.2 (2d Cir. 1996) ("In *Sheppard v. Beerman*, 18 F.3d 147 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994), we held that no Fourth Amendment 'seizure' took place when a fired court employee was escorted from the courthouse. We reasoned that because the plaintiff was free to go anywhere in the world, except the courthouse, he had not been 'seized.'"); *see also Hamilton v. Vill. of Oak Lawn, Ill.*, 735 F.3d 967, 972 (7th Cir. 2013) (Posner, J.) ("[N]ot every expulsion is a confinement, let alone a

seizure. The police didn't touch [plaintiff]—didn't grab and fling her from the house, which could be a form of seizure. They didn't threaten her. They ordered her out, and she left. Had she refused to go, they would have had to arrest her to get her out, and we would have a different case.").

For these reasons, plaintiffs' claims against Officers Romito and McCabe of unlawful removal and exclusion are also dismissed. Plaintiffs fail to plausibly state any claim for relief under the Fourth Amendment against either defendant.

### 3.   § 1983 Equal Protection Challenge

Construing the Amended Complaint liberally, it appears that plaintiffs also intend to assert an Equal Protection claim based on a theory of "selective treatment." *See* Pls.' Town Opp'n at 19 (noting the clause requires "the government to treat all similarly situated people alike" and citing a 'selective prosecution' case as support); *see generally LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980).

A *LeClair* claim for selective enforcement requires plaintiffs to allege that (i) they, compared with others similarly situated, were selectively treated, and (ii) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad-faith intent to injure the person. *Hu v. City of N.Y.*, 927 F.3d 81, 94 (2d Cir. 2019).

Plaintiffs, to satisfy the first element, "must identify 'a comparator who received more favorable treatment from the defendants.'" *Murphy v. City of N.Y.*, 719 F. Supp. 3d 357, 371 (S.D.N.Y. 2024) (quoting *Hu*, 927 F.3d at 91). "[T]he plaintiff's and comparator's circumstances must bear a reasonably close resemblance though they need not be 'identical.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). Put differently, plaintiffs must show that they were

25

similarly situated in all material respects to the individuals with whom they seek to compare themselves. *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 115 (N.D.N.Y. 2023) (Sannes, C.J.).

If plaintiffs intended to present comparators, they do not say so, nor whom. Plaintiffs may have sought to compare themselves to the parents of the two 'tumble-saulting' children or, perhaps, the guests who played loud music while they packed on Saturday night. Even if the Court were to accept these as appropriate comparators, one could only argue they received more favorable treatment from the Hotel defendants—*not* from Officers McCabe and Romito. As alleged, at no point did the officers interact with either group of possible comparators. In fact, the Complaint does not suggest that the officers interacted with anyone except the plaintiffs and other defendants that weekend.

Because plaintiffs fail to identify any comparator who received more favorable treatment from Officers McCabe and Romito, they fail to state a claim for selective enforcement. Accordingly, plaintiffs' Equal Protection claims against Officers McCabe and Romito are dismissed.

### 4.  § 1983 Free Exercise Challenge

The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. CONST. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the clause against the states). The clause "protects an individual's private right to religious belief, as well as 'the performance of (or abstention from) physical acts that constitute the free exercise of religion.'" *Kane v. De Blasio*, 19 F.4th 152, 163–64 (2d Cir. 2021) (quoting *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014)).

When making a Free Exercise Clause claim, a plaintiff "generally must establish that the object of the challenged law is to infringe upon or restrict practices because of their religious motivation, or that its purpose is the suppression of religion or religious conduct." *Collins v. City Univ. of N.Y.*, 2023 WL 1818547, at \*7–8 (S.D.N.Y. Feb. 8, 2023) (quoting *Okwedy v. Molinari*, 69 F. App'x 482, 484 (2d Cir. 2003) (summary order)) (internal alterations omitted). "Importantly, the protections granted under the Free Exercise clause 'do not relieve an individual of the obligation to comply with a valid and neutral law of general applicability.'" *Collins*, at \*8 (citing *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990)). "Where the government seeks to enforce a law that is neutral and of general applicability…it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Id.* (quoting *Fifth Ave. Presbyterian Church v. City of N.Y.*, 293 F.3d 570, 574 (2d Cir. 2002)). "The Free Exercise Clause does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* (quoting *Cent. Rabbinical Cong.*, 763 F.3d at 193).

Plaintiffs purportedly levy Free Exercise violations against Officers Romito and McCabe. *See* Am. Compl. ¶ 170 ("Plaintiffs had a right to be and remain on the Hotel premises and in their paid rooms; to exercise their religious freedoms; [and] to have their rights to the free exercise of their religion protected without unreasonable interference[.]"). But as ever, plaintiffs are coy about discussing any particulars. When pressed by defendants, plaintiffs provide the below elaboration in their opposition memoranda:

> The Town Officers, acting jointly with the Hotel, required Plaintiffs to violate the dictates of their religion[.]
>
> […]

"First Amendment rights may be curtailed only by the least drastic means." *United States v. Kahane*, 396 F. Supp. 687, 699 (E.D.N.Y. 1975), *mod. sub nom. Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975) (citing *Cantwell*, 310 U.S. at 303). Any limitation on the exercise of religious freedoms must be as narrow as practicable and clearly related to an appropriate governmental need. *United States v. Pablo Hernandez*, 209 F. Supp. 3d 542, 546 (E.D.N.Y. 2016).

The Town Officers had no legitimate need to require Plaintiffs to leave the hotel. Plaintiffs suggested any number of less restrictive actions that would have avoided forcing Plaintiffs to break the Sabbath.

Pls.' Town Opp'n at 19–20.

Nowhere do plaintiffs proffer any statute, law, regulation, court order, or the like on which they base these Free Exercise claims. Plaintiffs reference *Kahane*, which concerned an imprisoned orthodox rabbi seeking enforcement of a court order that he be placed in a correctional setting where he could obtain kosher foods and comply with other reasonable religious requirements. *See Kahane*, 396 F. Supp. at 689. Yet even the excerpt of *Kahane* quoted by plaintiffs, "First Amendment rights may be curtailed only by the least drastic means[,]" is immediately followed therein by two Supreme Court case citations: *United States v. Robel*, 389 U.S. 258, 268 (1967) and *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). Both concerned constitutional challenges to statutes that potentially violated the Free Exercise clause.[5]

---

[5] *See Robel*, 389 U.S. at 268 ("Our decision today simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms."); *see also Shelton*, 364 U.S. at 488 ("The statute requires a teacher to reveal the church to which he belongs, or to which he has given financial support."). The Court also notes that, in *Kahane*, it could only find one citation to *Cantwell*: "But where the government has total control over people's lives, as in prisons, a niche has necessarily been carved into the establishment clause to require the government to afford opportunities for worship. The free exercise clause embraces both the freedom to believe and the freedom to act according to those beliefs. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)." *Kahane*, 396 F. Supp. at 698. It does not appear, either, that *Cantwell* is discussed at any point in the Second Circuit's *Kahane v. Carlson* opinion. In fact, the part of *Cantwell* cited by plaintiffs even seems to go against their proposition. *See Cantwell*, 310 U.S. at 303–04 ("The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two

28

*Hernandez*, which plaintiffs also cite, is similarly off base. There, a magistrate judge ordered[6] a post-release condition forbidding the defendant—a parolee convicted for receiving child pornography—from "attend[ing] church services where minors [were] present." 209 F. Supp. 3d at 544. In vacating the parole condition, the district court emphasized that "conditions of supervised release must be 'narrowly tailored to serve a compelling government interest' so as not to unnecessarily deprive a defendant of his liberty." *Id.* at 545 (quoting *United States v. Reeves*, 591 F.3d 77, 82–83 (2d Cir. 2010)). Moreover, in its review, the district court noted the parole condition "touche[d] on two interests protected under the First Amendment: the right to associate and the right to exercise religion." And that, citing *Kahane*, "[l]imitations must affect prisoners and parolees with the least denigration of the human spirit and mind consistent with the needs of a structured correctional society." *Hernandez*, 209 F. Supp. 3d at 546. The court held that "no compelling government interest justifies prohibiting attending religious services where a minor is present," taking judicial notice "that minors are frequently present" at such services. *Id.*

Plaintiffs do not identify a governmental law, regulation, order, ordinance, or otherwise on which they wish to base their Free Exercise claims. True, they touch on the state's trespassing statute, *see* N.Y. Penal Law §§ 140.00, 140.05, in their opposition papers. But they do not do so to attack the law's validity or general applicability: "To be clear, Plaintiffs do not claim that they are immune from trespass under Penal Law § 140.05." Pls.' Town Opp'n at 22. Even if plaintiffs had managed to meet these basic requirements, they give no hint about, let alone plausibly allege, how Officers McCabe and Romito factor into or might be liable under this constitutional provision. Plaintiffs fail to state an Equal Protection claim in any cognizable form.

---

concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.").

[6] *See Hernandez*, 09-CR-703, Dkt. No. 53 ("Order Setting Conditions of Release").

After thorough consideration, the Court holds that plaintiffs fail to state any § 1983 claim against Officers McCabe and Romito.  Accordingly, Count II is dismissed in its entirety.

### iii.    § 1983 Individual Liability of Rachel Haines and Jacqueline Gordon

The Court now turns to the first of the claims against the Hotel defendants.  Count I is alleged against Rachel Haines and Jacqueline Gordon for their purported "[v]iolation of 42 U.S.C. § 1983[.]"  *See* Am. Compl. at 15.

 "Section 1983 provides remedies for violations of federal statutory and constitutional rights only by persons acting under color of state law."  *Thompson v. City of N.Y.*, 2024 WL 1216534, at *5 (S.D.N.Y. Mar. 21, 2024), *aff'd*, 2024 WL 4586530 (2d Cir. Oct. 28, 2024).  This requirement, that a defendant act under 'color of law,' means that the typical § 1983 claim is brought against state and local government officials and entities, not against private individuals or entities.  Private actors "may only be held liable under § 1983 where the conduct at issue constitutes 'state action'[—]which only occurs where the challenged action of a private party is 'fairly attributable' to the state."  *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 504 (N.D.N.Y. 2017) (Hurd, J.) (citing *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010)).

"Courts in the Second Circuit lack a single test to identify state actors, and instead three main tests have emerged[.]"  *Mumin v. City of N.Y.*, 760 F. Supp. 3d 28, 66 (S.D.N.Y. 2024).  A private entity's action is fairly attributed to the state: "(1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); [and] (3) when the entity has been delegated a public function by the state ('the public function test')."  *Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).  "Each of the three avenues requires a

fact-specific inquiry into the challenged conduct, and in order to find state action, a court must determine that the specific actions of which a plaintiff complains can be fairly deemed to be that of the state." *Berlin v. Jetblue Airways Corp.*, 436 F. Supp. 3d 550, 563 (E.D.N.Y. 2020).

Here, plaintiffs allege that "[i]n the course of her employment for the Hotel[,] Rachel [Haines] reached an…agreement with Sgt. Haines, that empowered her to deploy the police to deny the Hotel's services and accommodations to Jewish guests, at her discretion." Am. Compl. ¶ 135. Plaintiffs also allege that "[u]sing her special relationship and agreement with Sgt. Haines and his access to police power[,] Rachel [Haines] caused Plaintiffs to be subjected to the deprivation of their rights, privileges or immunities secured by the Constitution, including the Fourteenth Amendment, in violation of 42 U.S.C. § 1983." *Id.* ¶ 137. Additionally, plaintiffs allege that "[b]ecause of her connection to [R]achel, [J]ackie [Gordon] had the same access to the police power, and used that power to subject Plaintiffs to the deprivation of their rights, privileges or immunities secured by the Constitution, including the Fourteenth Amendment, in violation of 42 U.S.C. § 1983." *Id.* ¶ 138.

The remainder of Count I states as follows:

> Plaintiffs had the right to remain in the public areas of the Hotel premises and in their paid rooms, including the right to practice their religion there without state interference. Because they were Jews Plaintiffs were treated differently from other guests at the Hotel, were lumped together because they were Jews, were all held responsible for alleged infractions of a few unnamed individuals, and were blamed for the conduct of guests whom they did not even know. In violation of their rights, Plaintiffs were forced to break their Sabbath at significant spiritual and emotional cost, and were otherwise damaged. By reason of the foregoing, defendants Manager Rachel and Manager Jackie are liable to the Plaintiffs for all of their damages in amounts be determine at trial.

Am. Compl. ¶¶ 139–42.

Nowhere in the above excerpt do plaintiffs state that any of these (largely conclusory) actions were undertaken by Haines or Gordon—merely that, regardless of whoever did them, the two defendants are liable. Count I, "like many other counts in the Amended Complaint, [is] the sort…that illustrates plaintiffs' utter disrespect for Rule 8—It sets forth a potpourri of vague and conclusory allegations that…are not explicitly linked to any specific factual assertions[.]" *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 625 (S.D.N.Y. 1999), *aff'd,* 234 F.3d 1261 (2d Cir. 2000).

Even considering plaintiffs' unsupported assertions of a marriage-based antisemitic agreement between the Haines, plaintiffs do not come close to plausibly alleging that Rachel Haines or Gordon acted under color of state law. Once again, plaintiffs rely on nothing more than equivocal verbiage in an attempt to state a claim: "Rachel *caused* Plaintiffs to be *subjected* to[,]" and Gordon "*used* [Rachel's] power to *subject* plaintiffs to[,] the deprivation of their rights[.]" Am. Compl. ¶¶ 137–38 (emphases added). Paragraph 135 of the Amended Complaint does not provide support for this claim either: Beyond being nonspecific and conclusory, it only alleges that Haines was "empowered…to deploy the police to deny…Jewish guests" in an abstract sense—not that she did so here. These are threadbare legal conclusions. They do not and cannot support a plausible claim.

Plaintiffs have presented nothing that could lead the Court to infer that the Hotel defendants were willful participants in a joint scheme with the Town defendants. "[M]erely conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).

Further, Plaintiffs contend in their opposition papers that "Rachel and Jackie lied to the police." Pls.' Hotel Opp'n, Dkt. No. 51 at 28. "In our case, Plaintiffs allege that Jackie, acting

jointly with and at the direction of Rachel, the wife of the police chief, fabricated pretextual claims—e.g., lied about noise, about their children jumping on furniture, and about singing until 2:00 a.m.—and did so with the specific intent of causing the police to remove Plaintiffs from their paid rooms at the hotel against their rights. The actions of Jackie and Rachel constitute state action, regardless of whether the police officers shared their improper purpose." *Id.* at 17.

Yet the Court finds it difficult to identify any specific allegation in the Complaint that Haines or Gordon made false statements to Officers McCabe or Romito with the intent to deceive the officers and thereby induce them to take official action. Instead, the Complaint appears, rather consistently, to assert that all the individual defendants were co-conspirators in a scheme to deprive plaintiffs of their rights. *See, e.g.*, Am. Compl., Dkt. No. 37, ¶ 177 ("Manager Rachel, Manager Jackie, Sgt. Haines, and each of the Town Officers…had knowledge of the wrongs conspired to be done[.]"); *Id.* ¶ 180 ("Defendants, themselves, by their departments, agents, and employees, were reckless, careless and negligent in…colluding and conspiring with Manager Haines…to evict and exclude Plaintiffs[;]…inventing and abiding false pretexts and pretenses; reiterating pretexts asserted by others; failing to question the pretexts…undertaking the police conduct in bad faith…the Town Officers knowingly acted in a manner likely to be injurious…[and] caused Plaintiffs [to] sustain the harm of being treated like the victims of a pogrom or the Holocaust[.]"); *Id.* ¶ 169 ("At least one or more of the Police Officers conspired with Manager Rachel, the then-undisclosed spouse of Sgt. Haines, of the Town police, to remove, vacate, evict or dispossess Plaintiffs[.]").

Regardless, plaintiffs are incorrect: under any non-conclusory reading of the pleadings, the mere provision of information to law enforcement—whether true or false—does not, by itself, plausibly establish that Haines or Gordon acted under color of state law. *See Cheruvu v.*

*HealthNow New York, Inc.*, 2023 WL 3443362, at *2 (2d Cir. May 15, 2023) ("[T]he complaint asserts that defendants acted under color of state law by furnishing allegedly 'false information' to law-enforcement agencies[,] [b]ut the law is clear that the provision of information to law-enforcement agencies does not by itself make a private party a joint participant in state action under section 1983.") (internal alterations and citations omitted); *see also Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) ("Betts's claim against Shearman as a state actor boils down to the fact that he was arrested upon the false accusation of assault made against him by a private citizen to the police. This is insufficient to state a plausible claim that Shearman and the arresting officers shared a common goal of violating Betts's rights. The district court properly granted defendant Shearman's motion to dismiss.").

Accordingly, Count I is dismissed in its entirety.

### iv.    Individual Liability under §§ 1985 and 1986

Plaintiffs present their § 1985 claim "[a]gainst the Individual Defendants" and their § 1986 claim "[a]gainst Manager Rachel, Manager Jackie, Sgt. Haines, and the Police Officers[.]" *See* Am. Compl. at 20, 21. From the contents of the § 1986 claim, it can be inferred that "Police Officers" is used synonymously with "Town Officers," i.e., Officers McCabe and Romito. *See id.* ¶¶ 176–78. The Court infers the same for the § 1985 claim.

Section 1985 prohibits various conspiracies and consists of three subsections. *See* 42 U.S.C. § 1985. The first, § 1985(1), "is designed to provide a remedy against conspiracies that interfere with the performance of official duties by federal officers." *Affrunti v. Zwirn*, 892 F. Supp. 451, 455 n.4 (E.D.N.Y. 1995), *aff'd,* 100 F.3d 943 (2d Cir. 1996) (citing *Kush v. Rutledge*, 460 U.S. 719, 724 (1983)); *see, e.g.*, *Jordan v. Quiros*, 2024 WL 5112002, at *4 (D. Conn. Dec. 13, 2024).

Section 1985(2) and 1985(3) "provide causes of action based on conspiracies intending to violate a plaintiff's civil rights." *Jordan v. Dep't of Corr.*, 2024 WL 5112001, at *5 (D. Conn. Dec. 13, 2024). "The civil remedy for a violation of any of the [three] subsections is found at the end of § 1985(3)." *Kush*, 460 U.S. at 724.

Count IV of the Complaint states that "[t]he due course of justice was impeded, hindered, obstructed, or defeated by the actions of two or more of the individual defendants who conspired with intent to deny Plaintiffs the equal protection of the laws…[and] to injure Plaintiffs for lawfully enforcing, or attempting to enforce, the right of one or more of the plaintiffs to the equal protection of the laws[.]" Am. Compl., Dkt. No. 37 at 20–21. This language is taken nearly verbatim from the final clause of § 1985(2). "[I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws[.]" 42 U.S.C. § 1985(2).

Plaintiffs also assert—*twice*—in Count IV of the operative Complaint that "such conduct is covered by 42 U.S.C. § 1985(2)." Am. Compl. ¶ 171, ¶ 173. The claim concludes, "[b]y reason of the foregoing, each of the individual defendants who so conspired is liable to Plaintiffs for the injuries, deprivations and damages caused by any of such defendants pursuant to 42 U.S.C. § 1985(3)." Am. Compl. ¶ 174.

To reiterate: as pleaded, plaintiffs allege that defendants violated § 1985(2) and, as a result, plaintiffs are entitled to a civil remedy. But "[t]he gist of the wrong at which § 1985(2) is directed is…intimidation or retaliation against witnesses in…court proceedings." *Haddle v. Garrison*, 525 U.S. 121, 125 (1998); *see, e.g.*, *Bell v. New York State Dep't of Corr. & Cmty.*

*Supervision*, 2019 WL 1305809, at *11 (N.D.N.Y. Mar. 22, 2019) (Hurd, J.) (dismissing

plaintiff's claim for failing to allege he was a party or witness to a pending federal court matter);

*Empire Merchants, LLC v. Reliable Churchill LLP*, 2017 WL 7512900, at *1 (E.D.N.Y. Jan. 30,

2017) (holding that plaintiff failed to state a claim as § 1985(2) is "a civil rights statute designed

to protect the rights of parties and witnesses to federal proceedings"); *Johnson v. Comm'n on*

*Hum. Rts. & Opportunities*, 2024 WL 3649743, at *2 n.4 (D. Conn. July 8, 2024) (specifying the

second subsection of § 1985 "concerns conspiracies intending to deter 'any party or witness'

from participating in state or federal proceedings").

      In their opposition papers, plaintiffs attempt to rewrite Count IV.  Responding to the

Hotel defendants' dismissal motion, plaintiffs maintain that they alleged the group of defendants

engaged in both a § 1985(2) *and* a § 1985(3) conspiracy.  *See* Pls.' Hotel Opp'n at 23 ("Plaintiffs

has alleged that Jackie and Rachel engaged in a conspiracy in violation of § 1985(3).  Plaintiffs

allege 1) an agreement; 2) that Jackie and Rachel targeted Plaintiffs' right to practice their

religion, impeded their right to the equal protection of the laws; 3) and that they acted with an

invidious discriminatory animus."); *id.* at 24–25 ("Plaintiff thus alleged…the due course of

justice was impeded, hindered, obstructed, or defeated by the actions of two or more defendants,

who conspired with intent to deny to Plaintiffs the equal protection of the laws, and such conduct

is covered by 42 U.S.C. § 1985(2)") (citing Amended Complaint paragraphs 171 through 173

specifically).

      Yet in their response to the Town defendants' motion (filed only two days after plaintiffs'

response to the Hotel defendants), plaintiffs maintain they "alleged that Rachel engaged in a

conspiracy with Sgt. Haines, and the Town Officers under his command, in violation of

§ 1985 (3)[,]" omit the above language on § 1985(2), recharacterize Count IV as simply a

general § 1985 claim and—despite quoting directly from the second subsection in both briefs—remove reference to § 1985(2) in the 'List of Statutes and Other Authorities.'  *See* Pls.' Town Opp'n at 6, 25.

The Court will not entertain this duplicity.  Nothing in the Amended Complaint indicates a connection between the facts and harms alleged and any underlying judicial proceeding. § 1985(2) does not apply.  *See, e.g.*, *Thompson*, 2024 WL 1216534, at *8; *Bird v. Cnty. of Westchester*, 2022 WL 2263794, at *10 (S.D.N.Y. June 23, 2022) (citing *Morgan v. Dzurenda*, 2016 WL 6826156, at *4 (D. Conn. Nov. 18, 2016)).

Count IV is dismissed.

Section 1986 does not provide substantive rights.  *See Morgan*, 2016 WL 6826156, at *6. "A § 1986 claim must be predicated upon a valid § 1985 claim."  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (citing *Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir.), *cert. denied,* 436 U.S. 906 (1978)).  Because, as discussed above, plaintiffs do not state a § 1985 claim, their § 1986 claim is also not actionable.  Therefore, Count V is dismissed.

**v.      § 1983 Municipal Liability**

Count III is a *Monell* claim against Sgt. Haines and the Town of Hunter for "[f]ailure to [s]upervise and [t]rain[.]"  *See* Am. Compl. at 18–20.

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006).  The Court has already explained that *respondeat superior* is inapplicable to § 1983 claims.  Sergeant Haines and the Town of Hunter may not be held liable for the alleged conduct of Officers McCabe and

Romito solely on such a theory. *See Palmer v. City of N.Y.*, 564 F. Supp. 3d 221, 252 (E.D.N.Y. 2021) ("A municipality and its supervisory officials may not be held liable under § 1983 'for the conduct of a lower-echelon employee solely on the basis of *respondeat superior*.'") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991)).

Regardless, "[t]he Court need not and does not consider whether plaintiffs' allegations are sufficient to give rise to municipal liability for any of the underlying alleged constitutional violations claimed by plaintiffs because plaintiffs have failed to plead an underlying constitutional violation by a state actor." *Blanco v. Success Acad. Charter Sch., Inc.*, 722 F. Supp. 3d 187, 227 (S.D.N.Y. 2024).

Therefore, Count III is dismissed.

**B. State Claims[7]**

**i.    Negligent Infliction of Emotional Distress**

Plaintiffs label Count VI as a claim for negligent infliction of emotional distress ("NIED") against all defendants. Am. Compl. at 22. "To plead a[n] [NIED] claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). "To establish the fourth element, [a] plaintiff generally must plead that the breach endangered [their] physical safety or caused him to fear for his physical safety." *Id.* n.57 (2d Cir. 2021).

---

[7] During oral argument, plaintiffs represented to the Court that, even if their federal claims were dismissed, the Court would still retain jurisdiction over plaintiffs' state law claims based on diversity of the parties or pendent jurisdiction. Although plaintiffs acknowledged that they had not particularly alleged diversity jurisdiction in the Amended Complaint, they stated at argument that the parties were diverse and requested, if necessary, the opportunity to replead to assert diversity jurisdiction. The parties' briefing have presupposed the propriety of the Court's jurisdiction over all claims, and no defendant contested plaintiffs' assertion or request during or after argument. The Court will proceed to address plaintiffs' state law claims.

Plaintiffs' NIED claim "consists primarily of a single run-on sentence that spans nearly two full pages of their Amended Complaint but is devoid of factual detail and is, frankly, incomprehensible." *Rice v. City of N.Y.*, 275 F. Supp. 3d 395, 407 (E.D.N.Y. 2017); *see* Am. Compl. ¶ 180. "Specifically, it does not clearly indicate which of the numerous defendants in this action were allegedly negligent, whether they owed any duty to the plaintiffs, or which of their actions constituted a breach." *Rice*, 275 F. Supp. 3d at 407–08. "These inadequacies are particularly striking where, as here, plaintiffs are represented by counsel and have already amended their Complaint." *Id.* at 408.

Because Count VI neither complies with Rule 8, nor gives defendants fair notice of the claim asserted, nor states a claim for negligent infliction of emotional distress, it is dismissed.

### ii.    Intentional Infliction of Emotional Distress

Count VII claims intentional infliction of emotional distress ("IIED") by defendants Rachel Haines and Jacqueline Gordon. Am. Compl. at 24. To state an IIED claim, a party must allege "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)).

The bar for pleading IIED "is extremely high, and this highly disfavored cause of action is almost never successful." *Sesto v. Slaine*, 171 F. Supp. 3d 194, 201–02 (S.D.N.Y. 2016) (quoting *Guan N. v. N.Y. City Dep't of Educ.*, 2013 WL 67604, at *25 (S.D.N.Y. Jan. 7, 2013)). "As a result, 'such claims are routinely dismissed on pre-answer motion.'" *Medina v. City of N.Y.*, 2020 WL 7028688, at *13 (S.D.N.Y. Nov. 30, 2020) (internal citations omitted).

Plaintiffs allege that "Rachel [Haines] relied on the Town police as their [*sic*] private security force [and] abused her position, her connection to Sgt. Haines, the justice system, and the time of public servants, including the police." Am. Compl. ¶¶ 186, 188. They also allege Haines' and Gordon's conduct "was extreme and outrageous[,] vindictive, inhumane, and unacceptable in society[;] was deliberate and intended to cause severe emotional distress, or was…in disregard of a substantial probability of causing such distress, and caused Plaintiffs to sustain injury, including spiritual and emotional distress." *Id.* ¶¶ 184, 187, 189.

These allegations are conclusory. They also fail to plausibly allege the defendants engaged in any wrongful conduct, let alone any extreme and outrageous conduct. As such, Count VII is dismissed.

### iii.    New York State Human Rights Law

Count VIII claims that all defendants have violated New York Executive Law § 296. Am. Compl., Dkt. No. 37 at 25. Count IX claims the Hotel defendants violated New York Civil Rights Law § 40. Am. Compl., Dkt. No. 37 at 27. The New York State Human Rights Law ("NYSHL") is "comprised of the New York Executive Law §§ 292 *et seq.* (which provides the substance of the law) and the New York Civil Rights Law §§ 40 *et seq.* (which provides for penalties)." *New Hope Fam. Servs., Inc. v. James*, 2022 WL 4494277, at *8 (N.D.N.Y. Sept. 28, 2022) (D'Agostino, J.); *see Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 399–400 (E.D.N.Y. 2017) (citing *de la Rosa v. 597 Broadway Dev. Corp.*, 2015 WL 7351540, *17 n.16 (S.D.N.Y. Aug. 4, 2015) (employing the "collective term NYSHRL" in reference to both statutes)); *see also Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1998) ("Facts sufficient to sustain a cause of action under New York Executive Law § 296 will support a cause of action under § 40-c of the Civil Rights Law").

Plaintiffs assert intentional discrimination by defendants under several § 296 provisions. *See* Am. Compl. at 25 (listing N.Y. Exec. Law § 296(2)(a), 296(5)(b), and 296(6) as bases for the claim).  The standard for intentional discrimination under § 296 is identical to that for claims of discrimination under 42 U.S.C. § 1981.  *Clark v. City of N.Y.*, 2014 WL 4804237, at *4 (E.D.N.Y. Sept. 25, 2014).  To establish a § 1981 claim, plaintiffs must plausibly allege facts sufficient to support a showing that: (1) plaintiffs are members of a protected class; (2) defendants acted with intent to discriminate against plaintiffs; and (3) defendants' discriminatory act(s) concerned a contractual activity enumerated under the statute.  *Clark*, 2014 WL 4804237, at *2 (citing *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam))).  New York Civil Rights Law § 40 also requires that defendants act with the intent to discriminate against plaintiffs.  *See* NYCRL § 40 (prohibiting discriminatory conduct "on account of" an individual's protected class).

Moreover, "[t]o make out a claim against an individual defendant under the NYSHRL a plaintiff must either show direct, personal involvement in discriminatory conduct, or that the defendant 'aided and abetted' the discrimination or retaliation at issue, i.e., that the defendant 'encouraged, condoned or approved' it."  *Plasencia v. City of N.Y. Dep't of Educ.*, 2023 WL 6161928, at *3 (S.D.N.Y. Sept. 21, 2023) (quoting *Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 162–63 (E.D.N.Y. Nov. 21, 2011)).

Plaintiffs have not plausibly alleged discrimination perpetuated by defendants— intentional or otherwise.  Assuming momentarily that plaintiffs have established discrimination by the Hotel defendants, plaintiffs have still not sufficiently alleged that any Town defendant aided or abetted it.

Furthermore, NYCRL § 41—which provides the penalty for violation of § 40—requires that, "at or before the commencement of any action under this section, notice thereof shall be served upon the attorney general." NYCRL § 41. "The failure to comply with the notice provisions of New York Civil Rights Law Article 4 is fatal to a private action under that Article." *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 407 (N.D.N.Y. 2008) (McAvoy, J.). During oral argument, Plaintiffs told the Court that they had not provided such notice.

Counts VIII and IX are dismissed.

### iv.     Criminal Harassment under New York law

Oddly, Count X alleges that defendants Gordon and Romito violated New York's criminal statutes for first-degree and second-degree harassment, and, as a result, plaintiffs seek reprieve here. *See* Am. Compl. at 28 (citing N.Y. Penal Law § 240.25 and 240.26). Private citizens, however, cannot prosecute criminal actions in federal court. *Taylor v. Enter. Holding Grp., LLC*, 2020 WL 5634266, at *3 (S.D.N.Y. Sept. 18, 2020).

In their opposition papers, plaintiffs try to reframe Count X as pleading a claim for negligence *per se*. Pls.' Hotel Opp'n at 30; Pls.' Town Opp'n at 28. In support, they highlight that the claim asserts defendants committed "a tort of negligence and intentional infliction of emotional distress[.]" Am. Compl. ¶ 212. These are not the same.

Plaintiffs do not present a legally cognizable claim: Count X is dismissed.

### v.     "Respondeat Superior" Liability

Count XI is a claim for "respondeat superior" liability.[8] Am. Compl. at 28–29. "Respondeat superior…is not a separate cause of action, but rather is a doctrine that permits the

---

[8] Here too plaintiffs seek, once more, to amend the already Amended Complaint in their opposition papers, arguing that Count XI is a common law vicarious liability claim. *See* Pls.' Hotel Opp'n at 30–31. The Court declines to entertain these efforts.

imputation of liability on a principal or employer for the act of an agent or employee." *Clarke v. Antonini*, 2024 WL 1347578, at *10 (S.D.N.Y. Mar. 29, 2024) (quoting *Biberaj v. Pritchard Indus., Inc.*, 2009 WL 10738222, at *16 (S.D.N.Y. Sept. 28, 2009)); *see also Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 540 (S.D.N.Y. 2013) (citing *Donelli v. Cnty. of Sullivan*, 2009 WL 2365551, at *12 n.10 (S.D.N.Y. July 31, 2009)). Thus, Count XI is dismissed.

### C. Leave to Amend

Leave to amend a complaint should be freely given when justice so requires. FED. R. CIV. P. 15(a)(2). It is within the district court's sound discretion to grant or deny such leave. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Leave may properly be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment[,]" or the like. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008).

At the conclusion of the oral argument, plaintiffs alluded[9] to a request for leave to amend, citing the existence of other facts that they could add. Plaintiffs have already had an opportunity to cure the defects in their Complaint. They did not do so. While plaintiffs assert the existence of further facts that could supplement their pleadings, they have not revealed what these facts are, why they have not already incorporated them or sought leave to do so, or how such facts would cure the deficiencies already identified and further outlined in this opinion. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011).

---

[9] A brief aside is not a proper manner to seek leave to amend. *See* Local Rule 15.1(a) ("The motion [to amend] must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means.").

Additionally, during oral argument, Plaintiffs stated that "outside the record," they possessed evidence of an unspecified prior incident involving other Jewish guests at the Hotel. The relevance of this alleged event to the matter, or even the smallest detail about it, was not provided. In any case, this is not a new factual allegation. Plaintiffs included the same vague, blanket assertion in their Amended Complaint. *See* Am. Compl. ¶ 163 ("Upon information and belief…the Hotel had previously caused others to be evicted or threatened to [be] evicted, including persons who were obviously or apparently religious Jews, from the Hotel, at the direction of Manager Rachel.").

It is apparent that plaintiffs could not amend their pleading in good faith or accordance with Federal Rule of Civil Procedure 11.

Accordingly, the Court declines to grant leave to amend.

## V.    CONCLUSION

Plaintiffs have set forth a plethora of allegations; however, upon closer examination, their claims ultimately lack genuine substance.

Therefore, it is

**ORDERED** that

1.  The Hotel defendants' motion (Dkt. No. 41) is **GRANTED**;

2.  The Town defendants' motion (Dkt. No. 45) is **GRANTED**;

3.  Plaintiffs' Amended Complaint is **DISMISSED WITH PREJUDICE**;

4.  Defendants' Motions to Dismiss (Dkt. Nos. 20, 24) are **DENIED AS MOOT**.

The Clerk of Court is directed to terminate the pending motions (Dkt. Nos. 20, 24, 41, 45), enter a judgment accordingly, and close the case.

**SO ORDERED.**

Dated: June 11, 2025

Anthony J. Brindisi
U.S. District Judge

44